Filed 7/23/25  P. v. Hubbard CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERRELL HUBBARD,<br><br>Defendant and Appellant. | F086200<br><br>(Super. Ct. No. BF188483E)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL WEBBER,<br><br>Defendant and Appellant. | F086346<br><br>(Super. Ct. No. BF188483A)<br><br><br>Kern County |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVEON RAYNELL DAVIS,<br><br>Defendant and Appellant. | F086477<br><br>(Super. Ct. No. BF188483C)<br><br><br>Kern County |

THE PEOPLE,

     Plaintiff and Respondent,

     v.

HUEY CONERLY, JR.,

     Defendant and Appellant.

F086573

(Super. Ct. No. BF188483B)

Kern County

-ooOoo-

APPEAL from judgments of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Jerrell Hubbard.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant Michael Webber.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant Daveon Davis.

Spolin Dukes, Aaron Spolin and Caitlin Dukes, for Defendant and Appellant Huey Conerly, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On December 19, 2021, defendants Jerrell Hubbard, Michael Webber, Daveon Davis, and Huey Conerly Jr.[1] – all active members of the West Side Crips (WSC) gang –

---

     **[1]** Hubbard, Webber, Davis, and Conerly each filed separate appeals with this court.  On March 13, 2025, on this court's own motion, we consolidated case numbers F086200 (Hubbard); F086346 (Webber); F086477 (Davis); and F086573 (Conerly) under

2.

drove in a dark blue Nissan Rogue and used multiple firearms to fire 71 rounds on Castleford Street and Springford Court in Bakersfield, which resulted in gunshot wounds to both L.M. and T.D.[2]

Subsequently, a jury convicted defendants Hubbard, Davis, and Conerly[3] of the attempted premediated first degree murder of both L.M. and T.D. (Pen. Code, §§ 187, subd. (a), 189, 664; counts 1 & 3), and found them guilty of non-gang related firearm offenses (§§ 29800, subd. (a)(1), 29820, subd. (a)(1)) and enhancements (§ 12022.53, subd. (d)).[4] In a bifurcated trial, a jury found Hubbard, Webber, Davis, and Conerly guilty of the substantive gang offense (§ 186.22, subd. (a); count 13) (substantive gang offense), gang enhancements (§ 186.22, subd. (b)(1)) (gang enhancements), and gang-related firearm offenses (§ 25850, subd. (c)(3), count 7)[5] and allegations (§ 12022.53, subd (e)(1)).[6]

On appeal, Hubbard contends the evidence is insufficient as a matter of law to (1) "sustain a finding that [he] was a principal in the offenses charged in counts 1 through 6 and that he was a member of an uncharged conspiracy leading to liability for the charge in count 6" and (2) "sustain the jury's true findings on the section 12022.7, subdivision (a) great bodily-injury enhancement as to counts 2 and 4[.]"

---

one single case number, F086200. We address each of the defendants' claims made in their individual appeals in this consolidated opinion.

[2] Pursuant to California Rules of Court (CRC), rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3] As we discuss in detail below, the trial court declared a mistrial as to Webber regarding the attempted premediated first degree murder charges (§§ 187, subd. (a), 189, 664, counts 1 & 3), and the non-gang enhancement allegations alleged in counts 2, 4, and 5.

[4] All further statutory references are to the Penal Code, unless otherwise stated.

[5] Count 7 was renumbered to count 12 for the jury.

[6] We discuss in detail below the offenses, enhancements, and allegations for which each defendant was convicted and sentenced.

3.

Webber contends the evidence is insufficient as a matter of law "to support the jury's verdict in counts 2, 4, 5, and 6" and that "[r]eversal is required."

Conerly contends "[t]he People failed to present sufficient evidence to establish [his] participation in the offense." (Capitalization omitted.) Further, Conerly contends the trial court prejudicially erred when it: (1) "denied his motion for a mistrial based on a discovery violation"; (2) "overrul[ed] [his] objection to the admission of surveillance footage"; and (3) "admitted [his] cellphone search history regarding firearms and firearm-related information."[7] (Capitalization omitted.)

Further, on appeal, Webber and Davis collectively contend the gang enhancements must be reversed because of the changes made to the gang statutes through the passage of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333).

In light of the passage of Assembly Bill 333, the Attorney General concedes the substantive gang offense, gang enhancements, and gang-related firearm offenses must be reversed as to both Webber and Davis because the People failed to establish the "specific crimes committed during the shooting were intended to benefit the [WSC] gang in a way that was more than reputational."[8] We accept the People's concession, vacate the sentence, and remand for resentencing. Further, as we discuss in detail below, as to Hubbard and Conerly, we reverse the substantive gang offense, gang enhancements, and gang-related firearm offenses as well. On remand, the People are foreclosed from

---

[7] Conerly also contends his "sentence may constitute cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution." However, as we discuss in detail below, Conerly is entitled to a dismissal of the substantive gang offense, gang enhancements and gang-related offenses and allegations, and thus he is entitled to a full resentencing. Accordingly, as of now, his Eighth Amendment cruel and unusual punishment claim is moot.

[8] Because the changes made to Assembly Bill 333 apply to the substantive gang offense (count 13), as well as to the gang-related offenses and allegations (see § 186.22, subds. (e)(1), (g)), we reverse those charges as well.

4.

retrying defendants on these offenses and enhancements.  The other claims lack merit.[9]

In all other respects, we affirm the judgment.

## STATEMENT OF CASE

### I.   First Amended Information

The Kern County District Attorney filed a first amended information charging

Hubbard, Webber, Davis, and Conerly as follows:

*Substantive Offenses*

Attempted Premeditated First Degree Murder (§§ 187, subd. (a), 189, 664;
count 1), with a gang enhancement (§ 186.22, subd. (b)(1)), and two
firearm enhancements (§ 12022.53, subds. (d), (e)(1));

Assault with a Semiautomatic Firearm (§ 245, subd. (b); count 2 (T.D.)),
with gang (§ 186.22, subd. (b)(1)), firearm (§ 12022.5, subd. (a)), and great
bodily injury (§ 12022.7, subd. (a)) enhancements;

Attempted Premeditated First Degree Murder (§§ 187, subd. (a), 189, 664;
count 3), with a gang enhancement (§ 186.22, subd. (b)(1)), and two
firearm enhancements (§ 12022.53, subds. (d), (e)(1));

Assault with a Semiautomatic Firearm (§ 245, subd. (b); count 4 (L.M.)),
with gang (§ 186.22, subd. (b)(1)), firearm (§ 12022.5, subd. (a)), and great
bodily injury (§ 12022.7, subd. (a)) enhancements;

Discharging a Firearm at an Inhabited Dwelling House (§ 246; count 5)
(Castleford)), with a gang enhancement (§ 186.22, subd. (b)(1)) and two
firearm enhancements (§ 12022.53, subds. (d), (e)(1));

---

[9] Hubbard, Webber, Davis, and Conerly also contend the trial court erred in denying their motion to dismiss the case under the Racial Justice Act of 2020 (Assembly Bill No. 2542 (2019-2020 Reg. Sess.) (RJA)) because they established a prima facie case a violation occurred.  Hubbard also argued the trial court improperly denied his motion for discovery under the RJA.  However, the underlying basis for the RJA claims had to do with alleged racial bias by Officer Orozco that occurred during the gang trial (Phase II).  Because we are reversing the substantive gang offense, gang enhancements, and gang-related offenses and allegations in their entirety and the People are foreclosed from retrying defendants on remand, we need not address the RJA claims.

Discharging a Firearm at an Inhabited Dwelling House (§ 246; count 6) (Springford), with a gang enhancement (§ 186.22, subd. (b)(1)) and two firearm enhancements (§ 12022.53, subds. (d), (e)(1));

Three Counts of Unlawful Possession of a Firearm in Public by an Active Gang Member (§ 25850, subd. (c)(3); counts 7, 8, 9);

Substantive Gang Offense (§ 186.22, subd. (a); count 13);

Gang-Related Offense (§§ 186.22, subd. (d), 245, subd. (b); count 14).

*Factors in Aggravation*

The appellants "committed a crime that involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, within the meaning of California Rules of Court [(CRC)] Rule 4.421(A)(1)."

The appellants "w[ere] armed with or used a weapon at the time of the crime, within the meaning of [CRC] 4.421(A)(2)."

"[T]he manner the crime was carried out indicates planning, sophistication, or professionalism, within the meaning of [CRC] Rule 4.421(A)(8)."

Specifically, as to Webber and Davis, it was further alleged they were felons in possession of a firearm (§ 29800, subd. (a)(1); count 10), with a gang enhancement (§ 186.22, subd. (b)(1)). Further, as to Hubbard and Conerly, it was alleged they unlawfully possessed a firearm after being adjudged a ward of the juvenile court (§ 29820, subd. (a)(1); count 11), with a gang enhancement (§ 186.22, subd. (b)(1)). Finally, it was alleged that Webber unlawfully possessed cocaine while armed with a loaded firearm (Health & Saf. Code, § 11370.1, subd. (a); count 16).

The first amended information further alleged that Webber and Davis suffered a prior strike offense ((§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d), 186.22, subd. (d), 245, subd. (a)(2))) and a prior serious felony conviction (§§ 667, subd. (a), 186.22, subd. (d), 245, subd. (a)(2)).

## II. Phase I (Trial Regarding the Underlying Offenses) & Phase II (Trial on Gang Offenses, Enhancements & Allegations)

On August 22, 2022, the jury trial began, and the jury was sworn on September 30, 2022. The trial court granted defendants' motion to bifurcate the trial on the substantive gang offense, gang enhancement, and gang-related offenses and allegations.[10]

On December 8, 2022, following Phase I of the trial, the jury found Hubbard, Davis, and Conerly guilty on all charged counts in the first amended information, and found true all the non-gang related enhancements and allegations. As to Webber, the jury found him guilty of counts 2, 4, 5, and 6. However, the jury was unable to reach unanimous verdicts on counts 1, 3, and 10, or for any of the firearm and great bodily injury enhancements alleged in counts 2, 4, 5, and 6, and thus, a mistrial was declared as to those counts and enhancements. Further, the jury found Webber not guilty of count 16.[11]

On December 20, 2022, following Phase II of the trial, the trial court granted the prosecutor's motion to dismiss counts 7, 8, 9, and 14 as to Webber in the interests of justice (§ 1385). Thereafter, on December 22, 2022, the jury found defendants guilty of the substantive gang offense (count 13), gang-related offenses, and found true the gang enhancements and firearm allegations.[12]

---

[10] Although Hubbard's attorney made the objection, the parties stipulated "that if at any point during this trial one defense attorney either makes a motion or states an objection it will be deemed to have been joined in by all other defense counsel on behalf of their clients unless [they] make a specific record to the contrary."

[11] Count 16 was renumbered to count 11 for the jury.

[12] Specifically, as to Webber, due to the trial court declaring a mistrial as to counts 1, 3, and 10, and the jury finding him not guilty of count 16, the jury found true the gang enhancements as to counts 2, 4, 5, and 6 only. Further, the jury found true the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), as alleged in count 5.

### III.    Sentencing

The trial court then sentenced Hubbard, Webber, Davis, and Conerly as follows:

#### A.    Hubbard

As to count 1, the trial court sentenced Hubbard to an indeterminate term of 15 years to life, plus a 25-years-to-life term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)).  As to count 3, the trial court sentenced Hubbard to an indeterminate term of 15 years to life, plus a 25-years-to-life term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), to be served consecutive to count 1.  As to count 6, the trial court sentenced Hubbard to an indeterminate term of 15 years to life, to be served consecutive to count 3.  As to counts 2 and 4, the trial court sentenced Hubbard to the middle term of six years, plus a four-year term for the firearm enhancement (§ 12022.5, subd. (a)), a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)), and a three-year term for the great bodily injury enhancement (§ 12022.7, subd. (a)), but stayed these sentences pursuant to section 654.  As to count 5, the trial court sentenced Hubbard to an indeterminate term of 30 years to life, but stayed this sentence pursuant to section 654.  Finally, as to counts 7, 11, and 13, the trial court sentenced Hubbard to the middle term of two years, but stayed these sentences pursuant to section 654.  Overall, the total aggregate sentence imposed was an indeterminate term of 95 years to life.

#### B.    Webber

Prior to sentencing, the trial court found the prior strike and serious felony allegations to be true and denied Webber's *Romero*[13] motion.  The prosecutor then dismissed the counts and enhancements for which the jury had been unable to reach a verdict.

Thereafter, as to count 5, the trial court sentenced Webber to the middle term of five years, plus 25 years to life for the firearm enhancement (§ 12022.53, subds. (d),

---

[13] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

8.

(e)(1)), plus a five-year term for the prior serious felony (§ 667, subd. (a)), for a total of 35 years to life, doubled to 70 years to life because of the prior strike.[14] As to count 6, the trial court sentenced Webber to an indeterminate term of 15 years to life, doubled to 30 years to life because of the prior strike (see § 186.22, subd. (b)(4)(B)), plus a five-year term for the prior serious felony, to be served consecutive to count 5. As to counts 2 and 4, the trial court sentenced Webber to the middle term of six years, doubled to 12 years because of the prior strike, plus a five-year term for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed these sentences pursuant to section 654.[15] Finally, as to count 13, the trial court sentenced Webber to the middle term of two years, doubled to four years because of the prior strike, but stayed this sentence pursuant to section 654. Overall, the total aggregate sentence imposed was an indeterminate term of 100 years to life, plus a determinate term of five years.

## C. Davis

Prior to sentencing, the trial court found the prior strike and serious felony allegations to be true and denied Davis's *Romero* motion. Thereafter, as to count 1, the trial court sentenced Davis to an indeterminate term of 15 years to life, doubled to 30 years to life because of the prior strike, plus a 25-years-to-life term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), plus a five-year term for the prior serious felony (§ 667, subd. (a)). As to count 3, the trial court sentenced Davis to an indeterminate term of 15 years to life, doubled to 30 years to life because of the prior strike, plus a 25-years-to-life term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), plus a five-year term for the prior serious felony (§ 667, subd. (a)), to be served consecutive to count 1. As to count 6, the trial court sentenced Davis to an indeterminate

---

[14] Although not explicitly stated, it appears the trial court stayed the 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)).

[15] Specifically, as to count 2, the trial court also imposed a five-year term for the prior serious felony offense (§ 667, subd. (a)).

term of 15 years to life (see § 186.22, subd. (b)(4)(B)), doubled to 30 years to life because of the prior strike, plus a five-year term for the prior serious felony (§ 667, subd. (a)), to be served consecutive to count 3. As to counts 2 and 4, the trial court sentenced Davis to the middle term of six years, doubled to 12 years because of the prior strike, plus a four-year term for the firearm enhancement (§ 12022.5, subd. (a)), a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)), and a three-year term for the great bodily injury enhancement (§ 12022.7, subd. (a)), but stayed these sentences pursuant to section 654. As to count 5, the trial court sentenced Davis to the middle term of five years, plus 25 years to life for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), and a five-year term for the prior serious felony (§ 667, subd. (a)), for a total of 35 years to life, doubled to 70 years to life because of the prior strike, but stayed this sentence pursuant to section 654. Finally, as to counts 7, 10, and 13, the trial court sentenced Davis to the middle term of two years, doubled to four years because of the prior strike, but stayed these sentences pursuant to section 654.[16] Overall, the total aggregate sentence imposed was an indeterminate term of 140 years to life, plus a determinate term of 15 years.

**D. Conerly**

As to count 1, the trial court sentenced Conerly to an indeterminate term of 15 years to life, plus a 25-year term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)). As to count 3, the trial court sentenced Conerly to an indeterminate term of 15 years to life, plus a 25-year term for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)), to be served consecutive to count 1. As to count 6, the trial court sentenced Conerly to an indeterminate term of 15 years to life (see § 186.22, subd. (b)(4)(B)), to be served consecutive to count 3. As to counts 2 and 4, the trial court sentenced Conerly to

---

[16] Specifically, as to count 10, the trial court also imposed a three-year term for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed this term pursuant to section 654.

the middle term of six years, plus a four-year term for the firearm enhancement (§ 12022.5, subd. (a)), a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)), and a three-year term for the great bodily injury enhancement (§ 12022.7, subd. (a)), but stayed these sentences pursuant to section 654. As to count 5, the trial court sentenced Conerly to an indeterminate term of 15 years to life (see § 186.22, subd. (b)(4)(B)), but stayed this sentence pursuant to section 654. As to counts 7, 11, and 13, the trial court sentenced Conerly to the middle term of two years, but stayed these sentences pursuant to section 654. Overall, the total aggregate sentence imposed was an indeterminate term of 95 years to life.

Hubbard, Webber, Davis, and Conerly each filed timely appeals.

## SUMMARY OF FACTS

### I.  Phase I: Trial Regarding the Underlying Offenses

#### A.  Prosecution's Case-in-Chief

##### 1.  *The December 19, 2021 Shooting*

###### a.  L.M.'s Testimony

L.M. lived in a three-bedroom apartment at 6300 Castleford Street in Bakersfield. At approximately 8:00 p.m., L.M. "was in the house, and . . . was getting ready to leave" with a friend to go to the store. L.M. entered the passenger seat of her friend's vehicle and then "heard gunshots." The two of them drove off and L.M. eventually realized she had been shot in her neck and back. She then told her friend to "drop [her] off so [she] could call [her] sister." L.M. could not identify "the people who were shooting[.]"

###### b.  F.D. and T.D.'s Testimony

F.D., L.M.'s sister, also lived in an apartment at 6300 Castleford Street. At approximately 8:00 p.m., F.D. "was awakened with gunshot bullets coming through [her] window and [her] son [T.D.] yelling, trying to grab [her] youngest son from the bullets and trying to grab [her]." She was unable to discern how many gunshots she heard; all she heard "was just boom, boom, boom, boom, boom, boom, boom, boom, boom[.]" At

11.

this same time, T.D. who was sixteen years old, was playing video games when he was shot in his arm. Both F.D. and T.D. were unable to identify the shooter.

### c.        C.P.'s Testimony

At approximately 8:00 p.m., C.P. was washing dishes at his 6300 Castleford Street upstairs apartment when he heard approximately 50 gunshots. He testified "[m]aybe ten to 15 seconds" passed between the first shot and the last shot. C.P. then walked outside and "saw a car which [he] described as like a darker blue car . . . it looked like a [newer] Nissan Rogue or one like a notch smaller, which would have been like a Nissan Kicks." He observed the vehicle "back[] into the parking lot . . . [and] [a]s he was leaving out [he] saw somebody, like, going into the car." "[T]hen they just kind of floored it down to Wible [Road] and then just hit a right turn on Wible." He was able to identify a passenger as male but was unable to identify the race of the individual. He was unable to identify any of the individuals in the car.

### d.        C.V.'s Testimony

C.V. lived at a home on the 3500 block of Springford Court. At approximately 8:00 p.m., C.V. "had just returned home . . . [a]nd [her family] were sitting down to watch a Christmas movie, because vacation had just started." At or around this time, she "heard what [she] thought were fireworks – pop, pop, popping noises – and then [she] heard some glass shatter." "At that point [her] family . . . hit the floor [a]nd [she] noticed smoke starting to come into the room [and] [w]hen the noises stopped, [the family] got up." C.V. "noticed there were holes in [her] walls, and the smoke was coming from a television set that was mounted on a bedroom wall." She then "called 9-1-1." C.V. located "approximately nine [bullet] holes" in her walls. Further, as she called 911, she saw "somebody running down the street with a [gray] hoodie on." She could not identify the shooter(s).

12.

### 2. *Subsequent Law Enforcement Investigation*

At approximately 8:00 p.m., Bakersfield Police Department (BPD) officers heard upwards of 60 gunshots coming from the area of 6300 Castleford. Officers arrived on scene and observed bullet holes to the front of Unit 2 of the apartment complex. The officers entered Unit 2 and "several people led [them] to a back room where there was a juvenile [T.D.] that had a gunshot wound to the left arm." Officers searched the area around the apartment and located "67 bullet casings and one bullet fragment."

Officers spoke with witnesses and learned the suspect vehicle "was a four-door sedan . . . [d]ark blue color[.]" They also reviewed surveillance footage that showed "a blue Nissan Rogue" drive away from the apartment complex.[17] The witnesses were unable to identify any of the shooters or any of the persons inside the blue Nissan Rogue.

Subsequently, at approximately 10:50 p.m., officers initiated a vehicle stop on a dark blue Nissan Rogue in the area of 34th Street and Union Avenue in Bakersfield. "The vehicle briefly pulled over to the right side of the road, on the north side of the road, and continued at a slow rate of speed until it made a northbound turn onto L Street and began accelerating [¶] . . . [¶] and a vehicle pursuit was ensued."[18] The vehicle "match[ed] the description of the one provided to [officers] from . . . the scene of Castleford Street[.]"

The Nissan then reached speeds of 70 to 85 miles per hour as it fled from officers. The vehicle also ran multiple stop signs and red lights during the pursuit. Officer Celedon observed three subjects inside the vehicle. During the pursuit, Officer Celedon observed a black Taurus nine-millimeter firearm discarded out of the rear driver's side of

---

[17] In the surveillance video, the first male who exited the vehicle was wearing dark clothing, the second and third males who exited the vehicle were wearing black sweatshirts, and the fourth male was wearing a gray sweatshirt and dark pants.

[18] BPD Officer Celedon's body camera recorded the pursuit and the audio/video of the pursuit was played for the jury at trial.

the Nissan near L Street and 2nd Street in Bakersfield. The firearm was found "wedged underneath a car tire of a . . . truck" and officers eventually seized it and booked it into evidence. The firearm was loaded with seven live rounds – "[s]ix from the magazine and one in the chamber."

Additional officers joined in the pursuit of the Nissan. Officers observed the Nissan collide with another vehicle on the off-ramp of Highway 58. After the collision, Officer Celedon observed a second firearm thrown from the rear passenger side of the Nissan. Officers then located and seized this firearm, which turned out to be a loaded semiautomatic Glock 19 Gen 5 firearm with one live Winchester nine-millimeter round inside.

Officers then contacted the five occupants of the Nissan and placed them under arrest. Yazmin Walker[19] was identified as the Nissan's driver; Conerly was identified as the front seat passenger; Davis was identified as the driver's side rear passenger; Hubbard was identified as the passenger's rear side passenger; and Webber was identified as the rear middle seat passenger. "When [Conerly] stepped out of the vehicle . . . he stated he had a firearm [a]nd [officers] additionally could see the extended magazine protruding out of his pocket of his hooded sweater." Officers then seized a loaded Polymer 80 semiautomatic firearm and cell phone from Conerly. The firearm "was a high capacity . . . 31-round magazine" with "seven rounds inside of the magazine and one in the chamber, for a total of eight" rounds. Officers also searched Webber and found between 2.3 and 3.7 grams of cocaine, a " 'useable amount[,]' " in his pants pocket.

---

[19] The jury found Walker guilty of unlawful firearm possession (§ 29805; count 9) and felony evading (Veh. Code, § 2800.2, subd. (a); count 10). Specifically, as to Walker, the jury also found true the gang enhancements and gang allegations. Walker filed a notice of appeal with this court, but her appeal was dismissed for failure to file an opening brief.

Officers also searched the inside of the Nissan and located "an empty Glock magazine, a single live round[,] . . . a 31-round magazine with . . . seven live rounds[,]" and a surgical-style mask with six spent NFCR brand nine-millimeter shell casings. The 31-round magazine, which was found on top of the rear seat, appeared to be wrapped in either a white cloth or a T-shirt and contained seven rounds of Blazer nine-millimeter ammunition. In addition to Conerly's cell phone, officers located four other cell phones inside the vehicle. The first cell phone was found on the front driver's seat; the second cell phone was found on the driver's rear seat; and the third and fourth cell phones were found on the driver's side rear floorboard. Officers also swabbed the Nissan for latent fingerprints and DNA evidence.

Hubbard, Webber, Davis, and Conerly were then transported to the police station where they provided DNA samples. Officers also photographed the four individuals. Conerly wore a black sweatshirt with a "Roswell" logo; Davis wore a black sweatshirt with an "AERO 1987" logo; Hubbard wore a surgical mask, gray sweatshirt, and ripped jeans; and Webber wore a surgical mask and a black sweatshirt.

### 3.    *Jail Phone Calls*

The Kern County Jail recorded three phone calls made by Walker while she was incarcerated; they were played for the jury. During the first phone call, Walker stated, "I didn't do nothing, I took the police on the run . . . and then hit somebody['s] car." In the second phone call, Walker stated they "y'all tried to pull [her] over and [she] didn't stop, took them to the whole Bakersfield." Further, she stated "y'all can charge [her] with a pursuit . . . [b]ut all these other charges [are] bogus." Finally, during the third phone call, Walker stated these "[c]harges is hella bogus" because she was working at Pizza Hut during the shootings.

### 4. *Cell Phone Records*

Subsequently, officers authored search warrants and proceeded to search call records and the contents of each of the cell phones seized from the Nissan.[20] Walker's call detail records indicated her phone was stationary between the hours of 4:30 p.m. and 8:30 p.m. in the area of the Pizza Hut where she worked on December 19, 2021.

Per the text messages, Conerly picked Walker up from work and told her to "hurry up." Further, Conerly's cell phone contained internet searches for "Springfield XD firearms, specifically the XD9, the XD40, XD45, as well as different models of Glock firearms." Further, he searched for a "Glock 17 with switch,[21] Glock 19 with extended clip, Glock 19 Gen 5 [a]nd then in regards to firearms components there was real Glock 19 slide and Glock 19 slide."

On December 19, 2021, Hubbard, Webber, Davis, and Conerly's call detail records showed they pinged from the same cell towers in the period from 12:00 p.m. until 11:00 p.m. Specifically, at approximately 8:00 p.m., the four phones pinged from the cell towers covering Castleford – the area of the shooting. Further, once Walker was picked up from work, between 10:00 p.m. and 11:00 p.m., Hubbard, Webber, Davis, Conerly, and Walkers' cell phones pinged from the cell towers covering the area of 34th Street and Union Avenue where the pursuit began. Lastly, at approximately 11:00 p.m., the five phones pinged from the cell towers covering Highway 58.

---

[20] Hubbard's phone number ended in 4810; Webber's phone number ended in 4118; Davis's phone number ended in 5527; Conerly's phone number ended in 0375; and Walker's phone number ended in 9336.

[21] Bakersfield Police Department Officer Shipton testified "[a] switch is a device which replaces the back plate of a standard Glock firearm and allows it to be a select fire and actually fire fully automatic."

### 5. *Firearms, Ammunition, and DNA Evidence*

Law enforcement recovered 71 shell casings[22] from the Castleford shooting and submitted these casings to the Kern Regional Crime Laboratory for analysis. Additionally, the three firearms discarded during the pursuit were submitted and test-fired for analysis.

The 71 shell casings were categorized into four groups: Group one contained eight casings fired from the Taurus semiautomatic firearm; Group two contained 17 casings fired from the Glock 19 Gen 5 semiautomatic firearm; Group three contained 20 casings fired from the Polymer 80 semiautomatic firearm; and Group four contained 26 casings fired from an unknown firearm.

DNA analysis was also performed on the three firearms. Both Walker's and Conerly's DNA was found on the Polymer 80 firearm – the firearm recovered from Conerly's waistband after the pursuit. The Taurus firearm contained Davis's DNA – the first firearm that had been discarded from the rear driver's side window where Davis had been seated during the pursuit. The Glock 19 firearm contained Hubbard's DNA – the second firearm that had been discarded from the passenger's side rear window where Hubbard had been seated during the pursuit. Further, the Nissan's steering wheel contained both Walker's and Conerly's DNA.

Both Hubbard and Conerly stipulated they were "prohibited by law from possessing a firearm at the time of the alleged offense[.]" Both Webber and Davis stipulated they "had previously been convicted of a felony[.]"

### B. The Defenses' Case

Webber, Davis, and Conerly presented evidence in their defense.

---

[22] This includes the six spent shell casings recovered from the surgical mask after the pursuit.

17.

#### 1. *Webber's Case*

D. Brown was a private investigator for the defense. Brown testified there are 16 apartment units at 1010 Beale Avenue in Bakersfield.[23] Webber's phone number was different than the phone number of the cell phone recovered from the Nissan after the pursuit.

#### 2. *Davis's Case*

A. Pierce was a private investigator for the defense. Pierce went to the 2801 Trentino Avenue address in Bakersfield and took photographs of the residence. This address is "[a]bout two miles" from the Castleford shooting scene.[24]

#### 3. *Conerly's Case*

On February 1, 2022, M. Pezer, a crime laboratory technician, swabbed the 71 firearm casings for DNA evidence. A. Kennedy, the supervising criminalist with the Kern Regional Crime Laboratory, testified the prosecutor told her "he did not need any spent projectiles analyzed in this case[.]"

### C. The Prosecution's Rebuttal

The prosecutor admitted medical records for L.M. and T.D. Probation Officer M. Ojeda testified that as of October 2021, Webber resided at 1010 Beale Avenue, Apartment 16.

## II. Phase II: Trial on Gang Offenses, Gang Enhancements & Gang-Related Offenses/Allegations

BPD Officer Medrano testified as a gang expert for the prosecution. Officer Medrano testified the WSC is an active criminal street gang with "more than three

---

[23] Both Webber and the prosecution stipulated that he "had an address of 1010 Beale Avenue, Apartment 16, Bakersfield[.]"

[24] Davis's attorney argued during closing argument that Davis could have been home around the time when the Castleford shooting took place based on the location of the cell tower from which Davis's cell phone pinged.

members" in Bakersfield, and it has numerous subsets. The WSC's primary activities involve "burglaries, illegally possessing firearms, negligent discharge of firearms, assaults with deadly weapons specifically semiautomatic firearms, they're involved in narcotic sales, they're involved in possession of stolen property, involved in attempted murder, and murder." Further, "[t]he traditional boundaries for the [WSC] are California Avenue to the north, Union Avenue to the east, Brundage Lane to the south, and Highway 99 to the west." "The gang uses a few signs or symbols to identify themselves with" – specifically, "the Washington Nationals logo to represent West . . . the Minnesota Twins logo to represent one of their subsets which is Carnation Track . . . [and] the New York Yankees logo to show respect for a deceased member of the [WSC] who was murdered by an East Side Crip Saddam Ali."

Officer Medrano further testified that "fear plays a big part in a gang [and] [f]or a gang to be successful and commit crimes, they must instill fear in a community, they must instill fear in their own gang members, and they must instill fear in rival gang members." The WSC "achieve these goals by committing all these different crimes such as illegal possession of firearms, flashing firearms on social media, showing members of the community that they're not afraid of law enforcement . . . [and] [t]hey also do it to instill this fear into the community that hey, if you retaliate, if you talk to law enforcement, you're apt to be – to face consequences." Several Bakersfield police officers testified about the underlying facts and convictions for five predicate offenses committed by various WSC gang members. We discuss each of the five predicate offenses in detail below.

### A. Predicate Offenses

#### 1. *Offense #1*

On May 11, 2019, BPD Detective McNabb stopped a Dodge Charger with four occupants. The driver was identified as Malik Newell; the front passenger was identified as Webber; the rear driver's side passenger was identified as Jacquis Howard; and the

19.

rear passenger's side passenger was identified as Keshaun Smyer. Officers located a loaded nine-millimeter Makarov P-64 located in the center console and a loaded Polymer80-style firearm underneath the front passenger's seat – the area where Webber was seated. Newell had a "Washington Nationals W [tattoo] on one of his legs . . . [and] an SS tattoo on his arms[.]" Both Newell and Smyer wore ABM ParKgang shirts.[25] Howard wore "a black New York Yankees hat." As a result of this incident, Webber was convicted of committing a public offense on behalf of a gang (§ 186.22, subd. (d)).

### 2. Offense #2

On June 28, 2020, BPD Officer Orozco engaged in a pursuit of a silver Nissan Altima. During the pursuit, he observed "two black objects . . . discarded from that vehicle" "[a]t about the intersection of T . . . and Brundage Lane[.]" Eventually, Officer Orozco contacted the driver, Thaddeus Thomas, and the front passenger, Norris Jones. The first firearm located "was a black semiautomatic handgun, a[] [loaded] F&H 9mm" and the second firearm "was a black [loaded] semiautomatic handgun, a Smith & Wesson 9mm Shield." As a result of this incident, both Thomas and Jones were convicted of being in possession of an unregistered firearm (§ 25400, subd. (c)(3)). Officer Medrano testified both Thomas and Jones were active WSC members.

### 3. Offense #3

On July 10, 2020, BPD Officer Madsen contacted Dominic Deloney, Latimore Hunter, Levontae Burton, and Hubbard, and "[t]hey were hanging around two vehicles on the southeast location of [a] liquor store." Burton wore a "black-and-white Minnesota Twins hat with the letters TC or CT to the front." Officers searched the vehicles and located "two loaded firearms[.]" "The first firearm was a tan [nine-millimeter] P80 with a Glock 19 slide attached to it" loaded with "29 rounds in the magazine[,]" and the

---

[25] Detective McNabb testified that "[t]ypically in West Side Crip culture the PK is used to memorialize or represent the term Piru Killer." "[T]hose two letters are capitalized to make them stand out."

20.

second firearm "was a black [.40 caliber] P80 with a Glock 23 slide on it" loaded with 26 rounds in the magazine. As a result of this incident, Deloney was convicted of active participation in a gang (§ 186.22, subd. (a)), and Hunter, Burton, and Hubbard were convicted of being gang members in possession of a loaded firearm (§ 25850, subd. (c)(3)). Officer Medrano testified that Deloney, Hunter, Burton, and Hubbard were all active WSC members.

### 4. *Offense #4*

On July 29, 2020, BPD Officer McWilliams stopped a vehicle he recognized "from a shooting that had occurred about a week prior." Officers then contacted the driver, Byron Windham, and the front passenger, Tyrin Sanders. Officers searched the vehicle and located two firearms inside the vehicle. The first firearm "was a rifle that had been modified to basically simulate a handgun" found inside the glove compartment, and the second firearm "was a 9mm handgun" found between the driver's seat and the center console. As a result of this incident, both Windham and Sanders were convicted of unlawful possession of a firearm (§ 25850, subd. (c)(6)) with a gang enhancement (§ 186.22, subd. (b)(1)). Officer Medrano testified that both Windham and Sanders were active WSC members.

### 5. *Offense #5*

On October 9, 2020, Officer Madsen attempted to stop a 2010 black BMW for "[f]ront window tint and no front license plate." The black BMW then "began to evade [officers], and [they] lost sight of the vehicle." However, Officer Madsen was able to conduct a felony stop on the BMW and contacted the driver, Christopher Beasley, and the front passenger, Dontae Williams. Both Beasley and Williams had several gang-related tattoos.[26] Officers searched the vehicle and located "a turquoise bandana wrapped

---

[26] Specifically, Beasley had the following tattoos:

around the steering wheel [and] . . . located, in a black duffel bag, 40 rounds of .40 caliber ammunition." Additionally, officers located a .40 caliber Polymer 80 firearm discarded in the location of 2nd and L Street – along the route where the vehicle pursuit took place.

Officer Medrano testified both Beasley and Williams were active WSC gang members at the time of the offense. Further, as to this incident, Beasley was convicted of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and active participation in a gang (§ 186.22, subd. (a)), and Williams was convicted of active participation in a gang (§ 186.22, subd. (a)).

### B. Evidence of Tattoos and Prior "Street" Checks

Hubbard, Davis, Conerly, and Walker all have tattoos consistent with the WSC's signs and symbols; however, Webber has no tattoos. The parties also stipulated that Conerly has a tattoo on his neck that "depicts a money bag with a dollar sign."

The jury also heard evidence of Hubbard, Webber, Davis, and Conerly's prior "street checks" in which they were contacted by law enforcement while in the company of other WSC gang members. We examine these street checks in detail below.

---

> "There was 805 on his right hand, West Side right finger. [¶] 6th Street on his stomach, 6th Street on [his] right shoulder and left arm, Turk on his chest. [¶] The letter T on his right arm, W on his forehead, WS on his left arm. [¶] WSGC on his back. Lowell on right wrist. [¶] About that life six on his neck, hood or hood six six. So H-O-O-6-6. [¶] And then a cartoon character with a W . . . [o]n his right arm."

Williams had the following tattoos:

> "He had [a] Bakersfield [symbol] on his right arm, and he had the Warner Brothers symbol with the WS . . . on his left wrist. [¶] A number six on his left wrist, a skull with a bandana with a W on it on his left arm. [¶] And Turcs on the right of his chest."

Williams "was [also] wearing a black shirt that had a hand on it, displaying the hand sign of a W [a]nd then below it said West in Peace."

22.

### 1. *Hubbard's "Street" Checks*

As to Hubbard, on June 2, 2018, officers searched a home and spoke with Hubbard, who was 16 or 17 years old at the time. Officers spoke with Hubbard who stated he was a member of a "rapping crew" comprised of 10-12 members called Yancomb. Hubbard admitted he had a moniker of "Lil Bino" and became a Yancomb member "when he was 14 or 15 years old." He further told officers "some of the members do disrespect the East Side Crips" and they used hand signs to "represent the letter Y, and when the hand is flipped upside down it forms the letter M." Further, a few months later, officers observed Hubbard "throwing up the West Side Crip hand sign, which is, if you lift your hand up, you cross the middle and the ring finger."

On February 6, 2019, BPD Officer C. Hernandez searched a 2010 silver Mustang with two occupants – the driver, Enrique Sanchez, and the passenger Hubbard. Officers found "a black sweatshirt that said Yancomb Lil Sosa."[27]

On August 29, 2020, officers stopped a black BMW that had no license plates. Officers contacted the two occupants – the driver, Hubbard, and the passenger, Hunter. Officers searched the vehicle and located "a red Washington Nationals hat in the back seat, and there was a blue New York Yankees hat in the trunk."

On December 11, 2020, officers stopped a blue Nissan Altima for an illegal window tint. Officers contacted the six occupants: the driver, Serina Aguirre; the front seat passenger, Hubbard; the rear driver's seat passenger, Letwan Banks; the rear middle seat passenger, Shatalia Dixon; and the rear passenger's side passengers, Ceiane Sutton and her child, N.W. Officers searched the vehicle and "located a [loaded] Glock 43 underneath the driver's side rear passenger's seat, where Mr. Banks was seated, which had one round in the chamber and five rounds in the magazine." Further, officers located "a Glock-style magazine with approximately six live 9mm Luger ammunition." Hubbard

---

[27] "Lil Sosa" is Sanchez's moniker.

23.

admitted he was an active WSC gang member, and as a result of this incident, he was convicted of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and active participation in a gang (§ 186.22, subd. (a)).

### 2. Webber's "Street" Checks

On November 4, 2020, BPD Officer P. Hernandez "observed a 2002 Chevy Suburban, beige in color, exiting Brundage Liquors and onto westbound Brundage Avenue at a high rate of speed." Officers eventually stopped the vehicle and contacted its three occupants: the driver, Deontray Thomas; the front seat passenger, Camron Thomas; and the rear passenger, Webber.[28] Officers then searched the vehicle and "located a Glock 23, .40 caliber, semiautomatic pistol behind the front passenger's seat, directly in front of where Mr. Webber was seated." "There was one live round inside of the firearm, and there was also a magazine loaded with 21 live rounds of .40 caliber ammunition located on the floorboard behind the driver's seat." Further, Webber had a firearm "holster in his front waistband."

### 3. Davis's "Street" Checks

On April 4, 2015, BPD Detective McIntyre stopped "a black Chrysler 200 driving … with no front license plate." He then contacted the two occupants: the driver, Clarence Langston, and the passenger, Davis. Detective McIntyre observed Davis with "a turquoise bandana that was draped around his neck[,] which he knew "was a color that associated with the [WSC]."

### 4. Conerly's "Street" Checks

On May 11, 2021, Officer Medrano stopped a gold Buick four-door vehicle for an illegal window tint. He then contacted the driver, Conerly. Officer Medrano searched the vehicle and "located a red baseball cap with the Washington Nationals logo."

---

[28] Webber had a moniker of "Lil Fella."

Further, on November 20, 2021, BPD Officer Isbell contacted Conerly and located a loaded Taurus nine-millimeter firearm in his front waistband.  Conerly was then arrested for the firearm offense and transported to jail.  On the way to jail, Conerly "stated he needed to be housed with [WSCs] [¶] . . . [¶] [and] that he could not be housed with East Side Crips or Bloods."

## C.    Certified Prior Convictions

The prosecutor also admitted copies of certified prior convictions for Webber, Jamario Sanders, and Billy Jones.  Webber was convicted of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) and active participation in a gang (§ 186.22, subd. (a)); Sanders was convicted of attempted murder (§§ 187, subd. (a), 664), active participation in a gang (§ 186.22, subd. (a)), and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)); and Jones was convicted of assault with a firearm (§ 245, subd. (a)(2)), with a gang enhancement (§ 186.22, subd. (b)(1)), and active participation in a gang (§ 186.22, subd. (a)).

## D.    Gang Expert's Opinion

### 1.    *Opinion Regarding Gang Membership*

Officer Medrano opined that on December 19, 2021 – the date of the Castleford shooting – Hubbard was an active WSC member.  This opinion was based on prior "street checks," prior convictions of being a felon in possession of a firearm and active gang participation, use of gang signs on social media, status as a well-known rapper in WSC, presence at WSC hangouts, as well as his convictions for attempted murder, assault with a semiautomatic firearm, and shooting at an inhabited dwelling in the underlying case.

As to Webber, Officer Medrano opined he was an active WSC member on December 19, 2021.  This opinion was based on Webber's prior "street checks," social media activity, prior criminal convictions, and his convictions for assault with a semiautomatic firearm and shooting at an inhabited dwelling in the underlying case.

25.

As to Davis, Officer Medrano opined he was an active WSC member on December 19, 2021. This opinion was based on Davis's prior "street check," as well his prior conviction, and his convictions for attempted murder, assault with a semiautomatic firearm, and shooting at an inhabited dwelling in the underlying case.

As to Conerly, Officer Medrano opined he was an active WSC member on December 19, 2021. This opinion was based on Conerly's gang-related tattoos, prior "street checks," prior conviction, and his convictions for attempted murder, assault with a semiautomatic firearm, and shooting at an inhabited dwelling in the underlying case.

Finally, as to Walker, Officer Medrano opined that on December 19, 2021 she was an associate[29] of the WSC. This opinion was based on "officers [finding] a turquoise rag inside of her vehicle . . . [and] photographs of Ms. Walker's tattoos which she has a Washington Nationals W . . . [on] her left hand." Further, it was based on the circumstances of the underlying case and the convictions.

### 2. Opinion Whether Crimes Were Committed for the Benefit of, and in Association with, WSC

The prosecutor posed a hypothetical to Officer Medrano based on the facts of the Castleford shooting as follows:

> "[A]ssume that four active members of the criminal street gang the [WSC] drive to an apartment complex, they are armed with multiple firearms, loaded with extended magazines, all four members of the [WSC] criminal street gang are prohibited from possessing firearms, they exit the vehicle and stand immediately west of an apartment complex, they then fire at one apartment unit and they fire at an occupied vehicle parked immediately north of the complex, at least 70 shots are fired, two residences are struck

---

[29] Officer Medrano testified "[a]n associate . . . is someone who isn't a full-fledged gang member but is pretty much in the works, someone who either has family ties or friend ties to the gang, someone who typically has been around the gang, isn't really fully versed and well-educated on the whole inner workings of a gang but knows the basis and knows that they are involved in an ongoing pattern of criminal activity but in a sense keeps them – distances themselves from the gang."

by gunfire, one apartment unit and one home, two people are struck by gunfire and need medical attention, after the shooting, the four active members of the [WSC] flee the scene of the shooting."

Officer Medrano opined the crimes described in the hypothetical were committed in association with WSC. Specifically, he testified as follows:

"By working together and committing this shooting, it shows that there's strength in numbers by there being multiple members of the . . . [WSC] criminal street gang. It shows that there's strength in numbers by them being in a group of four showing that you wouldn't just take anyone to go commit a shooting like this. You would take four members that you have trust in, people that you're going to want to know that hey, if we get caught by law enforcement, they're not going to cooperate."

The prosecutor then posed a second hypothetical to Officer Medrano as follows:

"[A]ssume that four active members of the criminal street gang [WSC] are being driven by an associate of that gang. Inside of the vehicle are multiple guns, rounds of ammunition and extended magazines. During an investigative stop, the driver of the vehicle refuses to yield and leads officers on a high speed chase through Bakersfield. During the chase, multiple firearms are thrown from the vehicle. The chase concludes after the vehicle gets into a traffic collision."

Officer Medrano opined the crimes described in the second hypothetical were committed for the benefit of, an in association, with WSC. Specifically, he testified as follows:

"You have an association [*sic*] trying to assist the four members of the [WSC] associates in evading law enforcement possibly hoping that you guys – that they get away strengthening their numbers on the street, allowing them to be out of custody because as soon as a gang member goes into custody, it decreases the gang's strength on the street, it also benefits the gang by allowing them to discard the firearms during the pursuit in an attempt to prevent from getting convicted later on down the road if they are caught."

Officer Medrano also opined the crimes were committed in association with WSC because "it shows that there's four active members of the [WSC] working in concert to commit a crime. The associate is attempting to drive them away from law enforcement to

27.

prevent them from being arrested." This "shows that they're all knowingly attempting to evade law enforcement by discarding items during the vehicle pursuit."

## DISCUSSION

### I. Substantial Evidence Claims

Hubbard, Webber, and Conerly contend there was insufficient evidence to establish one or more of their convictions. We address each individual claim in detail below.

#### A. General Legal Principles

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 (*Cole*).) As such, the "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, fn. & italics omitted, superseded in part on other grounds by 28 U.S.C. § 2254(d).) Because we must draw all inferences in support of the judgment, a defendant "bears an enormous burden" when challenging the sufficiency of the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

### B. Hubbard's Contentions

#### 1. *Substantial Evidence Supports the Jury's Finding Hubbard was Involved in the Castleford Shooting*

Hubbard contends "[t]he evidence is insufficient as a matter of law to sustain a finding that [he] was a principal in the offenses charged in counts 1 through 6 and that he was a member of an uncharged conspiracy leading to liability for the charge in count 6." We disagree.

At the outset, Hubbard does not appear to challenge the sufficiency of the evidence as to any specific element present in counts 1 through 6, but rather argues that "rational jurors could not find [him] guilty beyond a reasonable doubt of participating in the shooting." However, when reviewing the evidence in the light most favorable to the judgment, there was substantial evidence establishing Hubbard's identity as one of the four individuals who participated in the Castleford shooting.

First, Hubbard wore a gray hooded sweatshirt at the time of his arrest, which was consistent with the individual who is observed exiting the passenger side of the Nissan. This was consistent with C.V.'s 911 call in which she stated she saw "somebody running down the street with a [gray] hoodie on."

Second, during the vehicle pursuit, officers observed an occupant throw a firearm out the rear passenger side of the Nissan, where Hubbard was seated. Officers then located a loaded Glock 19 Gen 5 firearm and forensic testing confirmed Hubbard's DNA was present on the firearm, and this firearm was used to fire 17 of the 71 casings recovered from the Castleford shooting scene.

Third, officers seized a cell phone from where Hubbard had been sitting in the Nissan. This cell phone, along with Webber, Conerly, and Davis's cell phones, transmitted from the same cell tower near the site of the Castleford address at the time the shooting occurred. This supported the jury's finding Hubbard was with Webber, Conerly, and Davis before and during the time of the shooting. Accordingly, all this

evidence provided the jury with reasonable, credible, and solid evidence from which a jury could conclude Hubbard was present and participated in the Castleford shooting.

Nonetheless, Hubbard argues: (1) "[t]he prosecution presented no direct evidence placing [him] at the scene of the crime [¶] [and] [t]he prosecution's case relied on circumstantial evidence from events that occurred approximately three hours after the shooting[;]" (2) "[n]o firearms or contraband were found on [his] person during the search incident to arrest [¶] [and] [t]he DNA evidence linking [him] to one of the recovered firearms (the Glock handgun) is weak and inconclusive[;]" (3) "[t]he cell phone location data presented by the prosecution is similarly imprecise and inconclusive[;]" and (4) "[t]he ballistics evidence presented does not directly implicate [him]." First, "[t]he fact that all the evidence was circumstantial does not lessen its weight, for circumstantial evidence is as adequate to convict as direct evidence." (*People v. Goldstein* (1956) 139 Cal.App.2d 146, 155 (*Goldstein*); see also CALCRIM No. 223 ["Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other."].) Therefore, although the surveillance footage, DNA evidence, and cell phone evidence all qualified as circumstantial evidence, this evidence was as "adequate to convict as direct evidence" (*Goldstein*, at p. 155), and provided substantial evidence to find Hubbard guilty of counts 1 through 6. Second, as to Hubbard's issues surrounding the accuracy of the DNA evidence, cell phone data, and ballistics evidence, "we do not reweigh the evidence . . . and the weight to be accorded to the evidence [because these] are matters exclusively within the province of the trier of fact." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790 (*Stewart*).) Therefore, "even if [this] evidence is also reasonably susceptible of an interpretation that suggests innocence" (*People v. Little* (2004) 115 Cal.App.4th 766, 771), "we are bound to sustain

30.

a conviction that is supported by only circumstantial evidence[.]" (*Ibid.*) Accordingly, substantial evidence supports the jury's guilt findings as to counts 1 through 6.

### 2. *Substantial Evidence Supports the Jury's Findings Hubbard Personally Inflicted Great Bodily Injury (§ 12022.7, subd. (a)) on L.M. & T.D.*

Further, Hubbard contends "[t]he evidence presented is insufficient to sustain a finding that [he] personally inflicted great bodily injury [(GBI)] on [T.D.] and [L.M.] within the meaning of Penal Code [section] 12022.7." (Italics omitted.) Specifically, he argues "there is no evidence linking the gunshot wounds sustained by [L.M.] and [T.D.] to bullets fired from the Glock Model 19 or any particular firearm." We again disagree.

### a. <u>Applicable Law</u>

Under section 12022.7, subdivision (a), "Any person who personally inflicts great bodily injury or any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) "The Legislature's use of the term 'personally inflict' in section 12022.7 signifies its intent to punish only actors who directly inflict harm." (*People v. Ollo* (2021) 11 Cal.5th 682, 693.)

In *In re Sergio R.* (1991) 228 Cal.App.3d 588 (*Sergio R.*), the court held that "where . . . more than one assailant discharges a firearm into a group of people and 'it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered.' " (*Id.* at pp. 601-602, quoting *People v. Corona* (1989) 213 Cal.App.3d 589, 594; *People v. Modiri* (2006) 39 Cal.4th 481, 486 ["For 20 years, courts have upheld personal-infliction findings where the defendant physically joins a group attack, and directly applies force to the victim sufficient to inflict, or contribute to the infliction of, great bodily harm."].)

31.

In *People v. Magana* (1993) 17 Cal.App.4th 1371, 1381 (*Magana*), the court held "[t]he analytic touchstone [in *Sergio R.*] . . . was the impossibility of determining which injury the accused had actually inflicted." The *Magana* court held there lacked substantial evidence to support the enhancement findings where, given the available evidence, the prosecution could have attempted to prove which injuries the defendant had *actually* caused but chose not to. (*Magana*, at p. 1381.) Specifically, the court explained as follows:

> "Eyewitness testimony established that [the] defendant and Adame used different weapons; [the] defendant shot a rifle while Adame shot a handgun. As the police identified the different types of bullets and cartridges retrieved from the crime scene, the People, through expert testimony, could have opined which firearm discharged which bullet. A bullet was removed from one victim and introduced into evidence but its caliber was never identified. The jury recognized this gap in the evidence by asking whether the People had to prove that [the] defendant had fired the bullets which shot the [victims], or establish that it was not possible to do so." (*Magana*, *supra*, 17 Cal.App.4th at p. 1381.)

Additionally, in *People v. Gutierrez* (1996) 46 Cal.App.4th 804 (*Gutierrez*), the court reiterated the following:

> "This [*Sergio R.*] exception applies only when proof of the personally liable defendant is impossible. If the prosecution could have introduced evidence revolving the issue, but did not, the failure of proof does not justify imposition of the enhancement on all potentially culpable defendants. [Citation.] The prosecution bears the burden of proving that either a defendant personally caused the great bodily injury or death of the victim, or it is impossible to determine which defendant caused the great bodily injury or death of the victim, and the defendant's conduct was of a nature that it could have caused the great bodily injury or death of the victim." (*Gutierrez*, *supra*, 46 Cal.App.4th at p. 816, italics omitted; see also *People v. Banuelos* (2003) 106 Cal.App.4th 1332, 1338 ["the prosecution does bear the burden of showing that it cannot be determined which assailant inflicted a particular injury in the context of a group beating"].)

In *Gutierrez*, a .380-caliber and two .25-caliber guns were recovered from the crime scene, and the fatal shot was fired from the .380-caliber firearm, but the prosecutor

made no effort to prove which defendant pulled the trigger. (*Gutierrez*, *supra*, 46 Cal.App.4th at pp. 809-810, 816.) The reviewing court determined that "the record does not reflect an impossibility of proof, but only a failure of proof . . . As such, we cannot conclude that the failure of proof of [the] identity of the shooter who personally caused the death justifies the imposition of the sentence enhancement on all three defendants." (*Id*. at p. 816.)

### b.      Analysis

Here, substantial evidence supports the jury's findings that Hubbard personally inflicted GBI on T.D. and L.M. during the Castleford shooting. As discussed above, law enforcement recovered 71 bullet casings from the scene, including 17 that were fired from the Glock 19 Gen 5 semiautomatic handgun – which was discarded from the area of the Nissan where Hubbard was seated and which contained Hubbard's DNA. During the shooting, T.D. was struck in the arm and L.M. was struck in the neck and back. However, law enforcement was unable to recover or determine the specific bullets that struck T.D. and L.M., which made it impossible to determine which defendant *actually* fired the bullets that inflicted the injuries sustained by both T.D. and L.M.[30] The evidence establishes that Hubbard and his three co-participants fired multiple gunshots at the Castleford apartment – striking both T.D. and L.M. Therefore, Hubbard's use of a firearm during the group shooting was sufficient to cause T.D. and L.M.'s injuries.

Nonetheless, Hubbard argues the GBI enhancement must be reversed because "[t]here was no evidence as to which firearm discharged the bullets that struck [T.D.] and

---

[30] As to L.M.'s neck injury, she testified, "the bullet is still in [her] neck." The record is silent as to the reason why this bullet was never removed. However, what is clear is that law enforcement was unable to take control of the bullet and test it to determine which firearm fired the bullet. Accordingly, " 'it [was] not possible [for the prosecution] to determine which assailant inflicted which injuries[.]' " (*Sergio R.*, *supra*, 228 Cal.App.3d at pp. 601-602; cf., *Magana*, *supra*, 17 Cal.App.4th at p. 1381; *Gutierrez*, *supra*, 46 Cal.App.4th at p. 816.)

[L.M.] [a]nd there was no evidence identifying any particular person firing at [T.D.] and [L.M.]." However, as discussed above, a defendant can still be punished with a GBI enhancement when the evidence establishes that "more than one assailant discharges a firearm into a group of people and 'it is not possible to determine which assailant inflicted which injuries[.]' " (*Sergio R.*, *supra*, 228 Cal.App.3d at pp. 601-602.) Because the evidence establishes that Hubbard, alongside his three co-defendants, used a Glock 19 Gen 5 and fired 17 bullets at the Castleford apartment *and* it was impossible to discern who fired the two bullets that struck T.D. and L.M., he could still " 'be punished with a great bodily injury enhancement [§ 12022.7, subd. (a)] . . . [because] his conduct was of a nature that it could have caused the great bodily injury suffered.' " (*Sergio R.*, at p. 602.) Accordingly, because it was impossible to determine who fired the gunshots that struck T.D. and L.M., substantial evidence exists to support the jury's true findings that Hubbard inflicted GBI on both T.D. and L.M. (§ 12022.7, subd. (a)), as alleged in counts 2 and 4.

### C. Webber's Contentions

Webber contends "[t]he evidence in this case, viewed in the light most favorable to the prosecution, did not provide substantial evidence that [he] was one of the shooters, was present at the scene of the shooting, or aided and abetted the shooters." We disagree.

### 1. *Substantial Evidence Supports the Jury's Finding that Webber was one of the Four Individuals who Participated in the Castleford Shooting.*

First, Webber argues that "[b]ased on [the People's] evidence, the jury could not conclude beyond a reasonable doubt that [he] was one of the shooters in this case." However, when reviewing the evidence in the light most favorable to the judgment, there was substantial evidence establishing Webber's identity as one of the four individuals who participated in the Castleford shooting. Webber's clothing at the time of his arrest was consistent with the clothing worn by the first individual in the surveillance video

34.

seen exiting the Nissan. Further, law enforcement seized a cell phone associated with Webber's address from the Nissan's backseat in the area where Webber had been sitting prior to his arrest. This cell phone, along with Hubbard, Conerly, and Davis's cell phones, transmitted from the same cell tower near the site of the Castleford address at the time the shooting occurred. Finally, Webber was located in the middle seat of the Nissan with his three co-participants immediately before his arrest. This is important because law enforcement observed two firearms being discarded from the same vehicle where Webber was located and subsequently arrested. Overall, this evidence provided the jury with reasonable, credible, and solid evidence from which the jury could conclude Webber was present and participated in the Castleford shooting.

Nonetheless, Webber attempts to analogize the facts of this case to *In re David K.* (1978) 79 Cal.App.3d 992 (*David K.*) and *People v. Sanford* (2017) 11 Cal.App.5th 84 (*Sanford*). However, both *David K.* and *Sanford* are distinguishable. In *David K.*, the victim was seated in the driver's seat of his car in San Francisco when he observed three minors. (*David K.*, at p. 997.) Two minors approached on the driver's side and one on the passenger's side, and one of the minors, George, put a knife near the victim's neck and forced him to surrender his car and money. (*Ibid.*) George entered the car and drove away. (*Ibid.*) The victim observed the heads of two other individuals in his car and he indicated "the individuals whom he saw at the time of the robbery were of Latin descent and that all three of the individuals were 25 to 26 years of age." (*Ibid.*) In contrast, David was a 17-year-old Caucasian. (*Id.* at p. 998.) Three hours after the robbery, police observed the victim's car in Yuba City – George and Salvador who were of Latin descent were in the front seat and David was in the rear seat. (*Id.* at p. 997.) David had no money on his person, but did have the victim's wallet between his legs. (*Ibid.*)

The appellate court reversed an adjudication order against David because the juvenile court's findings were not supported by substantial evidence. (*David K.*, *supra*, 79 Cal.App.3d at p. 1001.) Specifically, the court stated the following:

"The only evidence to connect the minor David with the robbery of [the victim] is the fact that three hours after the robbery, in a city some distance from the site of the robbery, David was found in the company of the identified robber in the stolen automobile with personal property of the victim being found in open view in the automobile. No cash proceeds of the robbery were found on David's person and the empty wallet, purse, and binoculars belonging to [the victim's wife] were in the back seat where David was seated. There is no evidence, however, that he was exercising any dominion or control over these articles. The situs of the articles as being in the back seat of the automobile where David was seated does not tend to establish that David was exercising any control over these articles. [¶] To draw an inference from these facts that David was one of the three persons at the site of the robbery three hours earlier in another city would amount to pure speculation. It is to be noted that [the victim] identified only the minor George as the actual perpetrator and gave a description to the police that all three persons involved were of Latin descent and were young adults. By no stretch of the imagination did appellant David, a Caucasian, fit into any of the categories." (*David K.*, *supra*, 79 Cal.App.3d at p. 1000.)

Further, in *Sanford*, six men robbed a jewelry store and were dressed in dark clothing, wearing hoodies, bandanas, and masks. (*Sanford*, *supra*, 11 Cal.App.5th at p. 86.) Eyewitnesses saw the men depart in two cars, including a black Dodge Magnum, and witnesses provided descriptions and the license plate number of the vehicle. (*Id*. at pp. 86-88.) Approximately 20 minutes after the robbery, law enforcement pulled over the black Magnum. (*Id*. at pp. 89-90.) There were three occupants inside the vehicle, all African-American males – two adults and the 16-year-old defendant, who was sitting in the backseat wearing dark jeans with gray shoes. (*Ibid*.) Witnesses identified certain items of clothing worn by the robbers but did not recognize any of the three people and there were no weapons, bandanas, masks, or jewelry in the car. (*Id*. at pp. 90-91.) There was no physical evidence that tied the defendant to the jewelry store, DNA recovered from the store did not belong to him, and none of the 17 fingerprints collected from the Magnum were his. (*Id*. at pp. 91-92.) The appellate court held that insufficient evidence supported the defendant's robbery conviction. (*Id*. at pp. 92, 95.) Specifically, the court stated the following:

"Almost no evidence was presented to establish that [the defendant] was there. To begin with, no physical evidence tied [the defendant] to the jewelry store. The DNA recovered from the store was not his. The shards of glass in the Magnum, while perhaps showing that someone in the car had been inside the store, were not found near [the defendant] or any of his belongings. No jewelry, guns, hammers, masks, or bandannas were found in the Magnum, much less in [the defendant's] possession, and [the co-defendant] claimed ownership of the dark hooded sweat shirt with gloves in the pocket, the only items of clothing found in the car that conceivably matched the witnesses' descriptions of what the robbers were wearing. No evidence was presented to show that [the defendant] was wearing either of the more distinctive clothing items identified by witnesses, the red sneakers or the belt. Nor was there any evidence of flight or other conduct by [the defendant] suggesting guilt. [¶] The only two pieces of evidence indicating that [the defendant] might have been one of the men at the robbery scene were the fact that he was in the Magnum when it was pulled over and the testimony of the witnesses that the participants in the robbery at the jewelry store were African-American men wearing dark-colored jeans and shoes." (*Sanford*, *supra*, 11 Cal.App.5th at p. 92.)

This case is distinguishable from both *David K.* and *Sanford.* Both courts in *David K.* and *Sanford* reversed the jury's findings because there was little to no evidence connecting the defendants to the robberies. (*David K.*, *supra*, 79 Cal.App.3d at p. 1000; *Sanford*, *supra*, 11 Cal.App.5th at p. 92.) However, unlike the facts present in *David K.* and *Sanford*, multiple pieces of evidence connected Webber to the shooting. In this case, Webber's clothing matched the clothing worn by the individual seen in the surveillance video leaving the Nissan; his cell phone transmitted from the same cell tower as the other three co-defendants near the Castleford shooting scene and at the same time when the shooting occurred; and he was found with the three co-defendants in the Nissan immediately after law enforcement observed two firearms involved in the shooting being discarded from the vehicle where Webber was located. Accordingly, there exists "reasonable, credible, and of solid value – from which a reasonable trier of fact could have the found" Webber was involved in the Castleford shooting. (*Cole*, *supra*, 33 Cal.4th at p. 1212.)

**2. *Substantial Evidence Supports the Jury's Finding Webber Aided and Abetted in the Shooting and that he Participated in the Conspiracy to Commit the Shooting.***

Second, in the alternative, Webber argues that "[a]ssuming . . . the evidence was sufficient to place [him] at the scene of the shooting, the evidence was still insufficient to prove that he aided and abetted the shooting." Specifically, he argues he "was not convicted of any of the firearm allegations and therefore the evidence was necessarily insufficient to prove that he was one of the shooters, or indeed that he even possessed a firearm." Although the jury acquitted Webber of count 16 (Health & Saf. Code, § 11370.1, subd. (a)) and was unable to reach a verdict as to the premeditated attempted murder charges (§§ 187, subd. (a), 664, counts 1 & 3), firearm possession charges (§ 25850, subd. (c)(3), count 7; § 29800, subd. (a), count 10)) and the firearm enhancements, this does not equate to insufficient evidence to support his convictions of assault with a semiautomatic firearm (§ 245, subd. (b), counts 2 & 4) and discharging a firearm at an inhabited dwelling (§ 246, counts 5 & 6). It appears the jury was unable to find beyond a reasonable doubt that Webber was a shooter; however, it did find beyond a reasonable doubt that Webber either aided and abetted the shooting *or* participated in an uncharged conspiracy. Therefore, when reviewing the evidence in the light most favorable to the judgment, we conclude substantial evidence exists to support Webber's convictions for counts 2, 4, 5, and 6 under the theories of direct aiding and abetting and conspiracy.

### a. <u>Webber Aided and Abetted the Shooting</u>

"A person who aids and abets the commission of a crime is culpable as a principal in that crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*), abrogated on another ground as stated in *People v. Oyler* (2025) 17 Cal.5th 756, 836-837; § 31.) "Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*Gentile*, at p. 843.) "First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice

aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Ibid.*, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

"Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided and abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*Gentile*, *supra*, 10 Cal.5th at p. 843.)  "A nontarget offense is the natural and probable consequence of a target offense 'if, judged objectively, the [nontarget] offense was reasonably foreseeable.'  [(*People v. Chiu* (2014) 59 Cal.4th, 155, 161 (*Chiu*).)]  The accomplice need not actually foresee the nontarget offense. 'Rather, liability " 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*Gentile*, at pp. 843-844, quoting *Chiu* at p. 162.)

" ' "Whether someone is an accomplice is ordinarily a question of fact for the jury" ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1222), and when an appellate court is tasked with reviewing a question of fact, it evaluates only for substantial evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [A reviewing court "scrutinizes for substantial evidence the resolution of a pure question of fact" and "the resolution of a mixed question of law and fact that is predominantly factual"].)  " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*); quoting *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.)

Here, as discussed in section (C)(1) *ante*, the surveillance video, cell tower data, and subsequent police contact provided evidence that Webber, Hubbard, Conerly, and Davis were all present at the Castleford shooting scene.  Further, all four co-participants

fled the shooting scene in the Nissan and after the felony stop, law enforcement located spent shell casings and ammunition magazines associated with the shooting – some of which were found in the backseat where Webber was seated.  Therefore, "the evidence, in our view, reasonably indicates that [Webber] played an affirmative supportive role in the [shooting] and was not simply an innocent, passive, and unwitting bystander." (*Campbell*, *supra*, 25 Cal.App.4th at pp. 409-410.)

### b.  Webber Participated in the Conspiracy to Commit the Shooting.[31]

Conspiracy is essentially an agreement by two or more persons to commit an unlawful act.  (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)  The crime has four elements: "(1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator."  (*Ibid.*, § 182, subd. (a)(1).)  The existence of an agreement "is the crux" of criminal conspiracy.  (*People v. Homick* (2012) 55 Cal.4th 816, 870 (*Homick*).)

"Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.' "  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, abrogated on another ground in *People v. Leon* (2020) 8 Cal.5th 831, 848.)  "[T]he existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially. ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' "

---

[31] The uncharged conspiracy instructions were only given as to counts 2, 4, 5, and 6 – the counts by which the jury found Webber guilty.

40.

(*Homick*, *supra*, 55 Cal.4th at p. 870, italics omitted.) As a result, "it is not necessary for the prosecution to prove the alleged conspirators made an express or formal agreement or that they ever met." (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1606, disapproved on another ground in *People v. Palmer* (2001) 24 Cal.4th 856, 861.) "[T]he agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute[.]" (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575, italics omitted.)

"[A] conspirator does not have to participate in the crime conspired." (*People v. Malotte* (1956) 46 Cal.2d 59, 65.) "Each party to a conspiracy is criminally responsible for all acts done in furtherance of the conspiratorial design. [Citations.] In legal contemplation, 'the act of one is the act of all.' [Citation.] In a concerted criminal venture, each party is equally culpable and should suffer the same consequences." (*People v. Nance* (1960) 181 Cal.App.2d 147, 150-151.)

The prosecution must establish that the defendant "had the specific intent both to agree to the conspiracy and to commit the object offense." (*Ware*, *supra*, 14 Cal.5th at p. 164.) To establish the requisite specific intent, the prosecution must show the defendant "intended to play some part in achieving the conspirator's unlawful ends. Put differently, '[t]here must be something more than "[m]ere knowledge, approval or of acquiescence in the object or the purpose of the conspiracy." ' " (*Id.* at p. 166.)

Here, when reviewing the evidence in the light most favorable to the judgment, substantial evidence exists to support Webber's convictions, as to counts 2, 4, 5, and 6, based on his participation in an uncharged conspiracy to commit the Castleford shooting with Hubbard, Conerly, and Davis. The evidence established the Castleford shooting was coordinated and planned rather than a random attack. At approximately 8:00 p.m., Webber and the three co-defendants drove to the Castleford address in a blue Nissan Rogue and the co-defendants fired at least 70 rounds towards Apartment 2. Prior to the shooting, Webber and the three co-defendants had spent the day together. Thereafter,

Webber, Hubbard, Conerly, and Davis got back in the Nissan and fled the scene. Accordingly, Webber's conduct in committing the above referenced overt acts represents substantial evidence to establish he had formed an agreement with Hubbard, Conerly, and Davis to commit the Castleford shooting.

### D. Conerly's Contentions

Conerly contends "there was insufficient evidence to convict him given the evidence presented at trial." Specifically, he argues "there were no eyewitnesses to the crime[;]" "officers did not ensure they were properly collecting the evidence in this case[;]" "[t]he [DNA] testing in this case could not determine when the DNA was even deposited on any given object[;]" and "there is no objective standard by which to corroborate Brown's [firearm expert] conclusion as the process is entirely subjective and Brown acknowledged that there was no way to determine whether her results were accurate." We disagree.

Here, when reviewing the evidence in the light most favorable to the judgment, substantial evidence exists to support Conerly's convictions. First, Conerly's clothing at the time of his arrest was consistent with the clothing worn by the third individual who exited the Nissan's driver's seat. Second, a cell phone seized from Conerly's person had transmitted from the same cell tower as Webber, Hubbard, and Davis's phones throughout the day on December 19, and those same phones transmitted from the same cell tower near the site of the Castleford shooting at the time of the shooting. Further, the cell phone in Conerly's possession contained searches for "Springfield XD firearms, specifically the XD9, the XD40, XD45, as well as different models of Glock firearms." As it related specifically to Glock firearms, the cell phone had a search for a "Glock 17 with switch, Glock 19 with extended clip, Glock 19 Gen 5 [a]nd then in regards to firearms components there was real Glock 19 slide and Glock 19 slide." These firearms were similar to the ones used in the shooting.

42.

Third, law enforcement seized a loaded Polymer 80 firearm from Conerly's person at the time of his arrest and subsequent testing determined the firearm contained Conerly's DNA and that this firearm had fired 20 of the 71 shell casings recovered from the Castleford shooting area. Finally, Conerly's DNA was found on the Nissan's steering wheel, which provided corroboration of him being the driver in the surveillance video. Overall, this evidence provided the jury with reasonable, credible and solid evidence from which the jury could conclude that Conerly was present and participated in the Castleford shooting.

Nonetheless, Conerly argues his convictions should be reversed because "there were no eyewitnesses to the crime" and the DNA and ballistics evidence lacks credibility because law enforcement failed to properly collect the evidence and there is nothing to corroborate Brown's (firearm expert) conclusions. However, as noted above, "we do not reweigh the evidence . . . and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (*Stewart*, *supra*, 77 Cal.App.4th at p. 790.) Accordingly, substantial evidence exists to support the jury's conclusion that Conerly was one of the individuals who participated in the Castleford shooting, and thus substantial evidence supports the jury's guilt findings.

## II.    Gang Allegations

Further, in their opening briefs, Webber and Davis contend there was insufficient evidence to establish the substantive gang offenses, gang enhancements, and gang-related firearm offenses. Additionally, in his opening brief, Hubbard contends the trial court prejudicially erred "when instructing on the elements of 'criminal street gang' and the collective engagement element by omitting instruction on the organizational nexus requirement[.]"

As indicated above, as to both Webber and Davis, the Attorney General concedes in its opening briefs they are entitled to a reversal of the substantive gang offense, gang enhancements and gang-related firearm offenses because "[t]here is insufficient evidence

43.

that [they] committed the Castleford Street shooting with the specific intent to promote, further, or assist in criminal conduct by gang members[,]" which is required under section 186.22, subdivisions (b)(1) and (g).  We accept the Attorney General's concession and reverse the substantive gang offense, gang enhancements, and gang-related firearm offenses against Webber and Davis.  However, because Hubbard and Conerly did not make an insufficiency of the evidence claim in their opening briefs, we must therefore decide whether this issue is forfeited on appeal.  As we discuss in detail below, we conclude this issue is not forfeited and reverse these offenses and enhancements as to Hubbard and Conerly as well.

### A.    Forfeiture

Generally, " '[w]hen an appellant fails to raise an issue in the opening brief . . . we . . . decline to address the issue or address it in a summary manner.' " (*Ramirez v. Charter Communications* (2024) 16 Cal.5th 478, 500 (*Ramirez*).)  Therefore, " '[i]ssues not raised in an appellant's brief are deemed waived or abandoned.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 836.)  This is due to the fact that " '[w]ithholding a point . . . deprives the respondent of an opportunity to answer it . . . Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before.' " (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 794.)  Accordingly, "[i]t is axiomatic that arguments made for the first time in a reply brief [or not all] will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)

With that being said, our Supreme Court has articulated that "[a]s a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates . . . a claim otherwise identical to one that was properly preserved . . . and to apply a legal standard similar to that which would also determine the claim raised on appeal." (*People v. Yeoman* (2003) 31 Cal.4th 93, 117; accord, *Cole, supra,* 33 Cal.4th at p. 1195, fn. 6.)  Here, as noted above, the Attorney General concedes that Webber and

Davis are entitled to a reversal of the substantive gang offense, gang enhancements and gang-related firearm offenses because "[t]here is insufficient evidence that [they] committed the Castleford Street shooting with the specific intent to promote, further, or assist in criminal conduct by gang members."  However, both Hubbard and Conerly did not make an insufficiency of the evidence claim in their opening briefs.  Although typically " '[w]hen an appellant fails to raise an issue in the opening brief . . . we . . . decline to address the issue or address it in a summary manner' " (*Ramirez, supra,* 16 Cal.5th at p. 500), the prosecutor in this case introduced the same five predicate offenses as to all four defendants to the same jury for the purpose of establishing "the offenses commonly benefited a criminal street gang[.]" (§ 186.22, subd. (e)(1).) Therefore, to consider the insufficiency of the evidence as it relates to all four defendants "entails no unfairness to the" Attorney General who had the opportunity to fully brief and address the sufficiency of the gang evidence as to Webber and Davis specifically. (*Yeoman*, at p. 118.)  Because the Attorney General had the opportunity to address the sufficiency of the gang evidence as to *all* defendants, fairness principles do *not* bar this court from addressing the sufficiency of the gang evidence as it relates to Hubbard and Conerly as well.  Accordingly, we address the sufficiency of the evidence claims as to all four defendants below.

### B.  General Legal Principles

"In 2021, the Legislature passed Assembly Bill [] 333 . . . known as the STEP Forward Act of 2021" and it "became effective January 1, 2022." (*People v. Burgos* (2024) 16 Cal.5th 1, 7, 9 (*Burgos*).)  "Assembly Bill 333 amended Penal Code section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation." (*Burgos*, at p. 7, fn. omitted.)  " 'First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, organized association or group of three or more persons." (§ 186.22, subd. (f), italics [omitted].)  Second, whereas section 186.22, former subdivision (f) required only

that a gang's members "individually or collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been "collectively engage[d] in" by members of the gang. (§ 186.22, subd. (f), (italics [omitted].)  Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational."  (§ 186.22, subd. (g).)' " (*People v. Clark* (2024) 15 Cal.5th 743, 752-753 (*Clark*), quoting *People v. Tran* (2022) 13 Cal.5th 1169, 1206.)  Our standard of review is sufficiency of the evidence.  (*People v. Renteria* (2022) 13 Cal.5th 951, 957-958.)

> **C.     Analysis**

>> **1.      *The Substantive Gang Offense (§ 186.22, subd. (a)), Gang Enhancements (§ 186.22, subd. (b)(1)), and Gang-Related Firearm Offenses (§ 25850, subd. (c)(3)))***

Section 186.22, subdivision (b)(1) provides for an enhanced sentence for a person convicted of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members[.]"  (§ 186.22, subd. (b)(1).)  As noted above, Assembly Bill 333 narrowed what it means for an offense to have benefitted a street gang, requiring that any " ' "common benefit" be "more than reputational." ' " (*Clark*, *supra*, 15 Cal.5th at p. 752.)  Section 186.22, subdivision (g) now provides as follows:

"As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Here, there was overwhelming evidence that Hubbard, Webber, Davis, and Conerly committed a primary activity (a shooting) of the gang together. However, as the Attorney General correctly states, the record is devoid of any evidence regarding the defendants' motives in committing the Castleford shooting. Specifically, the People failed to introduce evidence the shooting was the product of "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Overall, there lacks any evidence the shooting was intended to benefit the gang in a way that was more than reputational, which section 186.22, subdivision (g) now requires. Therefore, because of this lack of evidence regarding motivation behind the shooting, the substantive gang offense, gang enhancements, and gang-related firearm offenses must be reversed.

### 2.  *Firearm Allegations (§ 12022.53, subdivision (d) & (e)(1))*

Section 12022.53, subdivision (d) states the following:

"Notwithstanding any other law, a person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)

On the other hand, section 12022.53, subdivision (e)(1) states the following:

"The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

"(A)    The person violated subdivision (b) of Section 186.22.

"(B)    Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."  (§ 12022.53, subd. (e)(1).)

Essentially, section (d) imposes a 25-year-to-life enhancement for the personal discharge of a firearm that proximately causes death or great bodily injury to a person other than an accomplice in the commission of a described offense.  (§ 12022.53, subd. (d).) Subdivision (e)(1) does not itself create an enhancement; rather, it makes applicable one of the subdivision (b), (c), or (d) enhancements to a person who is a principal in the commission of a described offense *regardless* of whether that person personally used or discharged a firearm if the person violated section 186.22 and any principal used or discharged a firearm in the commission of a described offense.  Therefore, an aider and abettor in a gang promotion activity may be subject to a section 12022.53, subdivision (b), (c), or (d) enhancement even though he or she did not personally use or discharge the firearm so long as any principal in the offense did so.

As to Hubbard, Davis, and Conerly, the jury found true in Phase I of the trial the subdivision (d) enhancement, as alleged in counts 1, 3, and 5.  Specifically, the jury found that Hubbard, Davis, and Conerly "did personally and intentionally discharge a firearm which proximately caused great bodily injury or death to another person . . . during the commission" of counts 1, 3, and 5.  Further, the jury was instructed with CALCRIM No. 3149 (Personally Used Firearm: Intentional Discharge Causing Injury or Death), which required the jury to find that Hubbard, Davis, and Conerly *personally* discharged a firearm during the commission of counts 1, 3, and 5, and their acts caused great bodily injury to a victim.  Overall, the jury's true findings on the section 12022.53, subdivision (d) allegations did *not* require a gang finding.  Because the subdivision (d) findings did not require a gang finding, and thus, Assembly Bill 333's changes to section 186.22 are not implicated, the jury's true finding on the section 12022.53,

subdivision (d) allegations alleged in counts 1, 3, and 5 against Hubbard, Davis, and Conerly are affirmed.

With that being said, as to Webber, the section 12022.53, subdivision (e)(1) finding in count 5 must be reversed.[32]  Unlike, Hubbard, Davis, and Conerly where the jury found true beyond a reasonable doubt the three defendants *personally* used a firearm during the commission of counts 1, 3, and 5, the jury never made those same findings as to Webber.  Specifically, as to the section 12022.53, subdivision (d) enhancement, the jury hung as to these allegations on counts 1, 3, and 5 during Phase I of the trial.  Rather, the jury only found true the subdivision (e)(1) enhancement alleged in count 5 during Phase II of the trial, which allowed a guilt finding *only* if Webber violated section 186.22 and "at least one principal intentionally and personally discharged and personally used a firearm, and proximately caused great bodily or death to a person other than an accomplice[.]"  In fact, the jury was only provided CALCRIM No. 1402, which required the jury to find that Webber committed count 5 "in association with a criminal street gang" before finding the enhancement true.  Because the subdivision (e)(1) allegation required a finding that Webber "violated subdivision (b) of Section 186.22," the changes made to the gang statute by Assembly Bill 333 are implicated and thus, the section 12022.53, subdivision (e)(1) finding as to Webber must be reversed.

Because the jury was sworn in and impaneled on September 30, 2022, which was over nine-months *after* Assembly Bill 333 became effective on January 1, 2022 (*Burgos, supra,* 16 Cal.5th at p. 9), double jeopardy principles apply and the People are barred from retrying defendants on the substantive gang offense, gang enhancements and gang-

---

[32] As to Hubbard, Davis, and Conerly, the jury also found true the section 12022.53, subdivision (e)(1) enhancement alleged in counts 1, 3, and 5 during Phase II of the trial.  Because the subdivision (e)(1) enhancement required a gang-finding, we reverse *only* the (e)(1) enhancements against Hubbard, Davis, and Conerly.  As discussed in detail above, the jury's true finding regarding the subdivision (d) enhancement remains.

49.

related firearm offenses.  (*Hudson v. Louisiana* (1981) 450 U.S. 40, 44-45; *Burks v. United States* (1978) 437 U.S. 1, 17 [double jeopardy precluded retrial after the reviewing court held the evidence insufficient to sustain the jury's verdict of guilty].)  As to Webber, this includes both the section 12022.53, subdivision (d) *and* (e)(1) enhancement.

Accordingly, as to **Hubbard**, the following must be reversed:

-Substantive gang offense (§ 186.22, subd. (a)), as alleged in count 13;

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 6, and 8;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Carrying a loaded firearm as an active gang member (§ 25850, subd. (c)(3)), as alleged in count 7.

As to **Webber**, the following must be reversed:

-Substantive gang offense (§ 186.22, subd. (a)), as alleged in count 13;

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 2, 4, 5, and 6;

- Gang-related firearm enhancement (12022.53, subd. (e)(1)), as alleged in count 5.

As to **Davis**, the following must be reversed:

-Substantive gang offense (§ 186.22, subd. (a)), as alleged in count 13;

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 7;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Carrying a loaded firearm as an active gang member (§ 25850, subd. (c)(3)), as alleged in count 7.

Finally, as to **Conerly**, the following must be reversed:

-Substantive gang offense (§ 186.22, subd. (a)), as alleged in count 13;

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 6, and 8;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Carrying a loaded firearm as an active gang member (§ 25850, subd. (c)(3)), as alleged in count 7.

## III.    Conerly's Remaining Claims

Further, Conerly contends the trial court erred when it: (1) erroneously admitted the 6300 Castleford surveillance video and his "cellphone search history regarding firearms and firearm-related information" and (2) denied his motion for a mistrial based on an alleged *Brady*[33] discovery violation.  (Capitalization omitted.)  As to these remaining claims, they lack merit.

### A.    The Admission of the Surveillance Video and Cell Phone Search History

Conerly argues the trial court erred when it erroneously admitted the 6300 Castleford surveillance video and his "cellphone search history regarding firearms and firearm-related information."  (Capitalization omitted.)  Specifically, as to the surveillance video, he argues the video "contained an unreliable depiction of the events where it was concededly blurry, the colors were hard to determine, and the police could not confirm the video's time stamp."  Further, as to the cell phone search history, he argues "[t]he probative value of the search history evidence was substantially outweighed by the prejudicial effect to [him] as the jury would have likely viewed [him] as a violent individually solely based on knowing that he allegedly had searched for firearms or firearm-related content online."

---

[33] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

51.

### 1. *Additional Factual Background*

#### a. Surveillance Video (People's Exhibit No. 31)

C.P. was shown two videos from the night of the shooting and confirmed the videos (People's Exhibit Nos. 30 & 31) were accurate depictions of the events immediately before, during, and after the shooting. During C.P.'s testimony, Webber's attorney asked the trial court for a sidebar regarding the admission of People's Exhibit No. 31, which the trial court held off the record. Following the sidebar, the trial court stated it had "considered the objection we discussed at sidebar" and it "will make a record later."

Subsequently, outside the presence of the jury, the following relevant exchange occurred between the trial court, prosecutor, and Webber's attorney:

> "[TRIAL COURT]: [Webber's Attorney], when we had our sidebar regarding Exhibit 31 you made an objection, and I overruled it.
>
> "Go ahead.
>
> "[WEBBER'S ATTORNEY]: I objected, your Honor, because it lacks foundation. Also the witness testified to only seeing one individual. The video depicts – it looks like four different individuals. So it was on that basis that I objected, your Honor. [¶] . . . [¶]
>
> "[TRIAL COURT]: [Prosecutor], your offer of proof when [Webber's attorney] made his objection is that the witness would identify the car in this Exhibit 31 video as the same car he saw.
>
> "[PROSECUTOR]: That's correct.
>
> "[TRIAL COURT]: And, based on that, I overruled [Webber's Attorney's] objection."

#### b. Cell Phone History

BPD Detective Patino testified about the forensic data extraction he performed on Conerly's cell phone and defendants' cell phones seized in this case. Prior to Detective

Patino's testimony, the following relevant exchange occurred between the trial court, the prosecutor, and Conerly's attorney:

> "[CONERLY'S ATTORNEY]: The other is I expect a witness will testify as to some search history on Mr. Conerly's phone that involves searching for guns or gun-related information online. And my objection on this is on [Evidence Code section] 352 and relevance grounds. I don't believe there's going to be any testimony as to the date of the search, whether there was any action taken pursuant to the search or that the search was at all related to the incident in this case.

> "[TRIAL COURT]: [Prosecutor], what's . . . the probative value?

> "[PROSECUTOR]: Judge, the probative value is that this is a shooting case involving semiautomatic firearms, specifically Glocks. And the Defendant Conerly, Huey Conerly, was searching for the exact type of firearms that were seized and used in this case. They have a tendency in fact to prove that he was related to the shooting, in addition to the evidence that has been already provided. I believe the evidence is relevant, your Honor. And it, again, won't take up very much time of the jurors to hear this information as well."

The trial court overruled the objection and concluded that under Evidence Code section 352, "the probative value is not substantially outweighed by the prejudicial effect."

### 2. *General Legal Principles*

Only relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "A trial court has 'considerable discretion' in determining the relevance of evidence." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

A trial court's admission or exclusion of evidence is reviewed for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no

reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) We "will not disturb the court's ruling[s] 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

However, even if the trial court erred, evidentiary error is harmless if it is not reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Marks* (2003) 31 Cal.4th 197, 227 (*Marks*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) " 'Prejudice from erro[neous admission of evidence] is never presumed but must be affirmatively demonstrated by the [defendant].' " (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1616.)

### 3. *Analysis*

#### a. <u>Surveillance Footage (Exhibit 31)</u>

First, Conerly argues "[t]he surveillance footage was not relevant as it could not reasonably assist the prosecution in proving the events on the night in question because the footage contained an unreliable depiction of the events where it was concededly blurry, the colors were hard to determine, and the police could not confirm the video's time stamp."

Evidence Code section 250 defines a videotape as a writing and "[a]uthentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) Authentication requires "sufficient evidence for a trier of fact to find" that the video recording "is what it purports to be, i.e., that it is genuine for the purpose offered." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267 (*Goldsmith*); see also Evid. Code, § 1400.) " 'The fact conflicting inferences may be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Goldsmith*, at p. 267, quoting *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) The proof required to

authenticate a video recording "varies with the nature of the evidence that the . . . video recording is being offered to prove and with the degree of possibility of error." (*Goldsmith*, at p. 267.) Typically, a video recording is "authenticated by showing it is a fair and accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location." (*Id*. at pp. 267-268.)

Here, although Conerly argues the footage was "blurry, the colors were hard to determine, and the police could not confirm the video's time stamp[,]" these arguments about the quality of the video address the weight of the evidence, not its admissibility. C.P. testified the surveillance videos (People's Exhibit Nos. 30 & 31) were accurate depictions of the events immediately before, during, and after the shooting. Further, although C.P. made inconsistent statements regarding the color of the suspect vehicle, these credibility and factual issues affected the evidence's weight, but not its admissibility. Accordingly, because the surveillance videos were properly authenticated and highly probative of the factual disputes at issue in the trial, the trial court properly exercised its discretion in admitting the videos at trial.

### b. Cell Phone History

Second, Conerly argues "the trial court erroneously admitted [his] cellphone search history relating to guns and gun-related information" because "[t]he probative value of the search history evidence was substantially outweighed by the prejudicial effect to [him] as the jury would have likely viewed [him] as a violent individual solely based on knowing that he allegedly had searched for firearms or firearm-related content online."

Here, this search history was highly probative to establish Conerly as one of the individuals involved in the Castleford shooting. Conerly disputed his identity as one of the shooters. Therefore, evidence establishing that Conerly's cell phone had been used to

search the internet for information regarding various firearms – which were similar to the firearms used in the Castleford shooting – was highly probative to establish Conerly's involvement in the underlying offense.  Further, this search history evidence was unlikely to "unduly prejudice" Conerly because there was little to no risk this evidence would uniquely tend to inflame the jurors' emotions or cause them to use the evidence of an illegitimate purpose.  Just because the evidence was prejudicial, does not mean it was "unduly prejudicial." (*People v. Karis* (1988) 46 Cal.3d 612, 638 [" '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial" . . . "prejudicial" is not synonymous with "damaging" ' "].)

Nonetheless, Conerly heavily relies on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) in support of his position.  In *Albarran*, a jury convicted the defendant of crimes relating to a shooting at a party and a subsequent carjacking.  (*Id*. at pp. 217-218.) Although the defendant was charged with a gang enhancement, "[t]he prosecutor noted, however, that he had no percipient witness or evidence to prove the crime was gang related or motivated[.]" (*Id*. at p. 219.)  At trial, the only evidence the prosecution presented to show the shooting was gang related was that "(1) the shooting occurred in Palmdale, (2) it occurred at a party and gang members often commit crimes during parties; and (3) more than one shooter was involved." (*Id*. at p. 221.)  The trial court allowed the gang evidence, which included the defendant was a member of a gang, descriptions of the gang's activity – including threats against police officers and an ongoing gang "war." (*Id*., at pp. 221, 228.)

The Court of Appeal concluded the gang evidence was irrelevant and prejudicial. Specifically, it concluded, "There is nothing inherent in the facts of the shooting to suggest any specific gang motive.  In the final analysis, the only evidence to support the respect motive is the fact of [the defendant's] gang affiliation." (*Albarran*, *supra*, 149 Cal.App.4th at p. 227, fn. omitted.)  The court continued and stated, "Even if we

56.

were to conclude that evidence of [the defendant's] gang membership and some evidence concerning gang behavior were relevant to the issue of motive and intent, other extremely inflammatory gang evidence was admitted, which had no connection to these crimes. The prosecution presented a panoply of incriminating gang evidence, which might have been tangentially relevant to the gang allegations, but had no bearing on the underlying charges." (*Ibid.*)

Here, unlike in *Albarran*, Conerly's search history was relevant to establish his involvement and planning in the Castleford shooting. Specifically, Conerly searched for similar firearms used in the underlying offense, and this search of similar firearms established a "connection to these crimes." (*Albarran*, *supra*, 149 Cal.App.4th at p. 227.) Accordingly, because this evidence had a tendency to establish that Conerly was involved with the other co-defendants in committing the shooting *and* the search history evidence had little to no risk of causing him "undue prejudice," the trial court properly exercised its discretion under Evidence Code section 352 in admitting this evidence.

### 4. *Prejudice*

However, even if we assume the trial court erred in admitting the surveillance video and Conerly's search history, any error was harmless under the *Watson* standard of prejudice. As stated above, evidentiary error is harmless if it is not reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Marks*, *supra*, 31 Cal.4th at p. 227; *Watson*, *supra*, 46 Cal.2d at p. 836.) There was strong evidence of Conerly's guilt apart from the surveillance video and internet search history on his phone. Specifically, the cell phone seized from Conerly's person had transmitted from the same cell tower as Webber, Hubbard, and Davis throughout the day on December 19, and those same phones transmitted from the same cell tower near the site of the Castleford shooting at the time of the shooting. Further, and most importantly, Conerly possessed a Polymer 80 firearm on his person, which law enforcement later determined had fired 20 of the 71 shell casings recovered

57.

from the Castleford shooting area. The fact that Conerly was found in possession of the firearm used in the Castleford shooting is by itself overwhelming evidence of guilt. Overall, this evidence supported the jury's finding that Conerly was one of the perpetrators of the Castleford shooting. Accordingly, even assuming the trial court erred in admitting the surveillance video and cell phone search history, this presumed error was harmless under *Watson*.

## B. Alleged Discovery Violation

Further, Conerly contends he "was deprived of his constitutional right to due process where the trial court denied his motion for a mistrial based on a discovery violation." (Capitalization omitted.) Specifically, he argues the prosecutor violated *Brady* when he "did not disclose that he met with [C.P.] prior to his testimony without preserving the minutes of that meeting."

### 1. *Additional Factual Background*

#### a. <u>Relevant Factual History</u>

As previously discussed in the statement of facts, C.P. testified regarding his observations on December 19, 2021. Specifically, he testified he heard approximately 50 gunshots and he "saw a car which [he] described as like a darker blue car . . . it looked like a [newer] Nissan Rogue or one line a notch smaller, which would have been like a Nissan Kicks." Further, C.P. identified a passenger as male, but was unable to identify the race of the person.

Subsequently, on cross-examination, Conerly's attorney impeached C.P. with his prior testimony regarding the color of the Nissan as "dark blue or black." Further, he was confronted about his observation of the passenger and whether he was able to discern any identifiable characteristics. Finally, the defendants' attorneys questioned him about prior conversations with the prosecutor regarding the substance of his testimony.

During Conerly's cross-examination, the trial court addressed a sidebar conversation about Webber's objection regarding the admission of People's Exhibit

No. 31.  Specifically, the following relevant exchange occurred between the trial court,

the prosecutor, Webber's attorney, and Conerly's attorney:

> "[TRIAL COURT]: Turning now to the question of [the prosecutor] meeting with the witness [C.P.].
>
> "[Prosecutor], did you have an investigator present when you met with [C.P.]?
>
> [PROSECUTOR]:  I did.
>
> "And just so our record is clear, I informed all of the defense attorneys, back in chambers, on Monday morning, before we began.  [¶]
>
> "I then informed them that I met with [C.P.], the witness here in this case.  I had him listen to his body-worn statement.  I showed him two videos, Video No. 1 and Video No. 2.  And Kern County D.A. Investigator David Hubbard was present.
>
> "I informed the defense of this at the beginning of this week.  So I'm not entirely sure – perhaps memories are faded since then.  But I am absolutely sure I disclosed that.
>
> [¶] . . . [¶]
>
> [WEBBER'S ATTORNEY]:  We were told about [the prosecutor] talking to [C.P.] about his video, about what he saw.  There was never a disclosure that I am showing these two specific videos or that I have reviewed them with [C.P.], nor that there were discussions between the D.A. and [C.P.] to prepare [C.P.] for his testimony.  Because, if there had been, I guarantee you, your Honor, I would have delved further into it.  I would have asked additional questions of [C.P.].  And I am sure my colleagues would have done the same.
>
> "So I am not making an assumption here, your Honor.  I was not told about [C.P.] talking about Exhibit 31 or that he observed Exhibit 31 or that they met and conferred to prepare [C.P.] for his testimony, nor were we given any notification or notes from an investigator from the D.A.'s Office saying on this date and time I met with whatever.  That was never provided, your Honor.  And there's no assumption about that.
>
> "[TRIAL COURT]: [Conerly's Attorney].

59.

"[CONERLY'S ATTORNEY]:  Your Honor, [the prosecutor] did inform me that he met with witnesses.  I, to the best of my recollection, do not remember being told that [C.P.] was shown People's 30 and 31.

"Additionally, it appears from the witness's testimony that there's some issues as to what he remembers telling police officers and what he may have said to the District Attorney and their investigator.  I've, during this proceeding, E-mailed [the prosecutor] and requested a copy of their statement that they took from [C.P.] because I think that is important.

[¶] . . . [¶]

"[TRIAL COURT]: So there is a duty to provide ongoing discovery.  If you have a meeting with a witness, for example, to discuss evidence in the case, even if they are oral statements, you understand your duty to disclose that.

"[PROSECUTOR]:  I do.

"[TRIAL COURT]: So I am going to require counsel to meet and confer.

"I am glad to hear that [prosecutor] had his investigators present.  So, certainly, they can be examined with regard to what happened and what was said so we don't have to put an attorney on the witness stand.  That's the normal way to do it.  And then, if we need to have a[n] [Evidence Code section] 402 with an investigator, we will do that.

"So I am going to have counsel meet and confer.  Work it out.  I don't find that [the prosecutor] has, you know, committed some offense that I am going to take action on.  So let's communicate better.  So if [the prosecutor] tells you he met with a witness, I expect counsel to use due diligence and follow up and say what was the purpose of that, what was said by the witness, what did you tell the witness.  Let's make sure we – let's focus on those things."

Later on, Conerly's attorney asked for an Evidence Code section 402 hearing regarding the contents of the interview that the prosecutor had with C.P.  During that hearing, Investigator Hubbard testified he and the prosecutor met with C.P. on September 29, 2022, in preparation for the trial, and Investigator Hubbard created a report regarding their meeting.  During this meeting, C.P. "was shown a copy of the [body-worn camera] footage which reflected his interview with the Bakersfield Police Department on the evening this incident took place [a]nd he was provided a copy of the

60.

report that memorialized that interaction with the Bakersfield Police Department."
Further, C.P. "viewed a surveillance footage video" and was told "which date he would
be needed here to testify" and the prosecutor and defense attorneys were going to ask
questions, and he "just need[ed] to be honest in [his] responses."

On cross-examination, Investigator Hubbard clarified he wrote a report about this
meeting on October 5, 2022,[34] after he received a request from the prosecutor to do so.
Initially, he decided not to write a report because "there wasn't anything that was out of
the ordinary, so it wasn't documented."

### b.  Motion for a Mistrial

Following Investigator Hubbard's testimony, Conerly's attorney made a motion
for a mistrial.  Specifically, Conerly's attorney argued the following:

> "Your Honor, we have had the opportunity for defense counsel to meet and
> confer.  And at this time we are moving for a mistrial in this matter.  The
> basis for this motion is, number one, because it appears there has been a
> significant discovery violation by the People.  The discovery violation is in
> two parts.

> "Firstly, when the People met with what is arguably the most important
> civilian witness and eyewitness that they are presenting in this case, they
> made no attempt to preserve the statements made at that meeting.
> Investigator Hubbard testified that he took no notes at the time of the
> meeting.  He wrote no report after the meeting.  It was only last week, after
> the witness testified and after this issue arose, that [the prosecutor] asked
> him to write a report about what happened at that meeting.  In large part, he
> did not remember significant portions of that meeting.  He also could not
> confirm what pieces of evidence were actually presented to the witness.

> "The second part of the discovery violation is that the defense was not
> provided with information about that meeting until this issue arose and so
> had no opportunity to follow up on that until this time.  We are well into
> trial.  And we should have been provided a statement of what occurred at
> that meeting immediately after it happened.

---

[34] This was the same date that C.P. began his testimony.

"Secondly, our second basis for our motion for mistrial is that we have had no opportunity to investigate this person who apparently got into the car in the parking lot. The witness testified that he told the District Attorney at this meeting about this person getting into the car in the parking lot that appears nowhere previously in the witness's testimony. Officer Hackleman, who took the witness's statement, doesn't mention anything about this. Had the defense been aware of this, we could have investigated and followed up on that key piece of evidence that has been unknown to us until now.

"The third basis is that it appears that the prosecution has tainted the witness's testimony by showing the witness a video of something that he did not see that evening.

[¶] . . . [¶]

"The prosecution showed [C.P.] the video of the car that was taken through some blinds. That apparently was of the car on Loyalton which he would have seen. But the other video they showed him was on Castleford, which was not something that he would have seen. The people getting in and out of the car and that whole scene was not something that he himself perceived. And so by showing him that video during this meeting they tainted his memory and his recollection of those events.

"For these reasons, we believe that there is no other appropriate remedy other than for the Court to declare a mistrial.

"I will note that the Court has confirmed that [C.P.] is subject to recall. And recalling [C.P.] is not a remedy for any of the problems I discussed, because it doesn't cure the discovery violations. It doesn't cure the fact that Investigator Hubbard has very little recollection of what occurred at that meeting. [C.P.] has stated what he told the D.A. I don't think recalling him is going to fix any of the troublesome problems that are now before us."

The People then responded to the motion for a mistrial. The response is as follows in relevant part:

"The People are opposed to the defense's motions for a mistrial. And just so the record is clear, I want to make sure that I give the Court my recollection of the statements, when they were and when they were provided to the defense attorneys.

"As Investigator Hubbard indicated, the meeting with [C.P.] happened the end of the week of the [September] 26th, when we were picking a jury.

62.

[¶] . . . [¶]

"There was a meeting with [C.P.] that happened in the evening hours, consistent with the testimony of the investigator here in this case, at approximately 4:45 [on September 23rd]."

[¶] . . . [¶]

"As the investigator indicated this morning, the meeting was between myself, [C.P.] and the investigator. The meeting did not happen in my office. The meeting occurred in the conference room. I showed [C.P.] a copy of his portion of the police report. He listened to his portion of the body-worn cam[era.] I showed him two videos which are the same videos that I showed him here in court, only they were introduced during the course of his testimony. And he indicated that he recognized what was depicted in those videos. The interview or the meeting between myself and [C.P.] and the investigator concluded.

[¶] . . . [¶]

"I specifically recall having a conversation with all of the defense attorneys . . . where I specifically informed them that I had met with [C.P.], that I had reviewed with him the report, listened to his body cam[era] with him, showed him two videos, and that he had nothing to add or subtract to any of those items.

[¶] . . . [¶]

"There was never any request from any of the defense attorneys for a statement or additional discovery in regards to either of those witnesses.

"As Investigator Hubbard indicated here in court, [C.P.] could only testify on Wednesdays. I scheduled his testimony for October 5th. He testified on October 5th.

"So the People are – there was no discovery violation at all. I disclosed to the defense the information in regards to [C.P.] . . . before he testified.

"In regards to this new discovery that the defense is claiming regarding when an individual entered or exited or got into the vehicle that is seen in the video, it's very clear, based on the testimony of [C.P.] during the course of all examination, that his memory of the events were better back on December 19th, 2021, when he made the statement to Officer Hackleman.

63.

"I asked him that on the stand, if his memory was better. He indicated that it was back when he gave the statement. I asked him if he recalled the chain of events happening in the fashion consistent with people entering the car, the car then backing up, and then fleeing the scene, as opposed to his testimony here in court being the car backing up, one individual entering the vehicle, and then fleeing the scene. He indicated that it's quite possible that it happened the first way as opposed to the second way.

"Additionally, we heard the statement of [C.P.] through the body-worn cam[era] of Officer Hackleman where he indicates that the people actually entered the vehicle first. They then backed up from Castleford onto Loyalton and then fled the scene, consistent with what he originally told officers at the very beginning.

"Witnesses change their testimony or give altered versions of events in every jury trial. These are issues that almost always come up, and these are not issues that amount to a mistrial at all."

After further argument, the trial court took the matter under submission and "order[ed] [its] court reporter to prepare the transcript of Witness [C.P.] . . . [and] reserv[ed] a ruling until [it] ha[d] a chance to review the transcript of [C.P.'s] testimony here in the court as well as giving counsel an opportunity to review that further."

### c. Trial Court's Ruling

At the hearing on the mistrial motion, the trial court summarized the parties' arguments before comparing C.P.'s prior statement to Officer Hackleman with C.P.'s trial testimony. The trial court then issued its tentative ruling and denied the mistrial motion as follows:

"So my tentative on the motion for mistrial is to deny it. I don't find that there was any violation of the discovery rules or discovery orders by [the prosecutor].

"There was a[n] [Evidence Code section] 402 [hearing] with the Investigator Hubbard. It's my understanding that Hubbard did prepare a short report of the little he could recall about the meeting. It was provided to defense counsel.

"And I find that [the prosecutor] was credible in stating that he met with the witness, showed him the body-worn camera video, what he described as

64.

videos one and two and the police report and that the defense – and the witness did not tell him anything different from what he had told both Officer Hackleman as well as what he testified to during the trial; that he saw one person get into the car in the parking lot area.

"To the extent that the defense argued that they had no opportunity to investigate the person who got into the car, I find that that that was something that they were aware of from the evidence in the police report and the body-worn camera video when Hackleman interviewed the witness. It is not something that first became known around the time of [the prosecutor's] meeting with the witness. I don't find that [the prosecutor] improperly tainted the witness's testimony by showing him the videos. And after this was all disclosed and discussed, after we came back from lunch that day all defense counsel had an opportunity to follow up with [C.P.] about what happened at the meeting with [the prosecutor], what [the prosecutor] said to the witness, what the witness said to [the prosecutor].

"So I don't find that there's any prosecutorial misconduct or violations of discovery. I do not find that the defendants have been denied a fair trial or that there has been a miscarriage of justice.

"So my tentative is to deny the motion for mistrial, deny any request to find that [the prosecutor] has engaged in prosecutorial misconduct or discovery violations."

The trial court then heard further argument from the parties. However, the trial court confirmed its tentative ruling and stated the following:

"I am going to confirm my tentative. The same findings that I have already expressed in my tentative, that there is no miscarriage of justice. The defendants have not been denied a fair trial. I don't find any discovery order violations. Again, I appreciate there can be misunderstandings. It's unfortunate if some defense counsel either didn't hear [the prosecutor] say he showed the witness three different videos, including Video 1 and Video 2.

"I will just reiterate the point I made on the day that this first came up, which is part of our transcript here, is that I do expect counsel to exercise due diligence. And if you aren't sure what [the prosecutor] did at the meeting with the witness, I think you have a duty to make inquiry further. I am not saying anyone failed to do their job completely. I am just saying in the future, if you are not sure what [the prosecutor] is talking about, what the prosecutor is talking about, make sure you exercise due diligence and clarify.

65.

[¶] . . . [¶]

"I don't find that it violates any rules of professional conduct I'm aware of. Obviously, it gives the defense an opportunity to cross-examine the witness and try to establish that this witness is telling the jury things that he doesn't even know about but only because the prosecutor is feeding him, you know, ideas and information and make that argument to the jury that, you know, this is the reason why you shouldn't give this witness as much weight, if any; because he is just repeating what the prosecutor wanted him to say.

[¶] . . . [¶]

"And also I want to make the point that [C.P.] is subject to recall. If there's something else that you think needs to be established from all of this, get [C.P.] back here and put it on."

### 2. *Standard of Review*

We review the trial court's rulings on discovery violations for abuse of discretion. (*People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 987.) "Conclusions of law or mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) Before there can be reversal of a criminal conviction based on the erroneous admission of evidence, the defendant must show it is reasonably probable, that in the absence of the erroneously admitted evidence, a result more favorable to the defendant would have been reached. (*People v. Champion* (1995) 9 Cal.4th 879, 923, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860; see *Watson*, *supra*, 46 Cal.2d at p. 836; see also Cal. Const., art. VI, § 13.)

### 3. *Applicable Law*

#### a. <u>Brady</u>

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) "Under the due process clause of the federal Constitution, the government has the obligation to disclose to the defendant evidence in its possession that

66.

is favorable to the accused and material to the issues of guilt or punishment. [Citations.] Evidence is material if a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." (*People v. Jenkins* (2000) 22 Cal.4th 900, 954 (*Jenkins*).) A delay in disclosure of evidence does not necessarily implicate a defendant's due process right to be informed of material evidence favorable to the accused. (*Id.* at pp. 950-951.)

"[A] true *Brady* violation occurs when three conditions are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Under this standard[,] prejudice focuses on 'the materiality of the evidence to the issue of guilt or innocence.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 274 (*Lucas*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

### b.   Section 1054.1

Section 1054.1 provides, in pertinent part, that the "prosecuting attorney shall disclose" certain types of material to defense counsel if the evidence "is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies[.]" (§ 1054.1.) Evidence subject to disclosure includes "names and addresses of persons the prosecutor intends to call as witnesses at trial" (§ 1054.1, subd. (a)), "[s]tatements of all defendants" (*id.*, subd. (b)), "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" (*id.*, subd. (c)), any "relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts" (*id.*, subd. (f)), and "[a]ny exculpatory evidence" (*id.*, subd. (e)). Such disclosure "shall be made at least 30 days prior to the trial" or as soon as the prosecution learns of the documents or information. (§ 1054.7.) To prevail on a

claim alleging a violation of discovery statutes, the defendant must show there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 (*Zambrano*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

### 4. *Analysis*

First, the prosecutor did not commit a *Brady* violation by failing to disclose notes concerning his pretrial meeting with C.P. As stated above, "a true *Brady* violation occurs when three conditions are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*Lucas*, *supra*, 60 Cal.4th at p. 274.)

Here, Conerly has failed to establish the evidence was suppressed as a result of a presumed violation. The prosecutor "informed [the defense attorneys] that [he] met with [C.P.], the witness here in this case . . . [and] had him listen to his body-worn statement . . . [and] videos, Video No. 1 and Video No. 2." He "informed the defense of this at the beginning of th[e] week." During the Evidence Code section 402 evidentiary hearing, Investigator Hubbard corroborated the prosecutor's representations to the trial court and stated, "[T]he purpose of [his] presence during the meeting or those meetings was to document anything that was out of the ordinary that would have come up [a]nd there wasn't anything that was out of the ordinary, so it wasn't documented."

Further, the trial court correctly concluded the defendants' counsel had been placed on notice that C.P. had observed an individual getting into the Nissan the night of the shooting. Specifically, the trial court found "that was something that they were aware of from the evidence in the police report and the body-worn camera video when Hackleman interviewed the witness" because C.P. had told Hackleman he observed "somebody just like walking into the car and slamming" the door. Because C.P. was

available for interview and there is no indication the prosecutor possessed C.P.'s statement prior to trial, the evidence was not suppressed by the prosecutor. (See *People v. Morrison* (2004) 34 Cal.4th 698, 715 ["[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery"].) Accordingly, the prosecutor did not violate his *Brady* discovery obligations.

Second, we also find the prosecutor did not violate his statutory discovery obligations pursuant to Evidence Code section 1054.1. As noted above, based on the police report and body-worn camera, defendants' counsel became aware of C.P.'s statement and "[i]t is not something that first became known around the time of [the prosecutor's] meeting with the witness." Further, "after this was all disclosed and discussed . . . all defense counsel [including Conerly's attorney] had an opportunity to follow up with [C.P.] about what happened at the meeting with [the prosecutor], what [the prosecutor] said to the witness, [and] what the witness said to [the prosecutor]." Finally, C.P. was *always* subject to recall and if there was something that Conerly's attorney wanted to address, she should have put C.P. "back here [on the stand] and put it on." Accordingly, the trial court properly exercised its discretion in denying Conerly's motion for a mistrial based on a violation of section 1054.1

### 5. *Prejudice*

However, even assuming the trial court erred in denying Conerly's discovery motion, we still conclude Conerly would be unable to establish prejudice. To establish prejudice under *Brady* and section 1054.1, the defendant must establish "a reasonable probability . . . that a different result would have occurred in the proceeding had the evidence been disclosed to the defense." (*Jenkins*, *supra*, 22 Cal.4th at p. 954; *Zambrano*, *supra*, 41 Cal.4th at p. 1132.) As noted above, the parties became aware of the alleged discovery violation during C.P.'s cross-examination, and C.P. was still subject to recall *three weeks* (October 5, 2022 to October 27, 2022) after Conerly's attorney first

became aware of the alleged violation. Therefore, Conerly's attorney had ample opportunity to cross-examine C.P. about any discrepancies between his trial testimony, potential prior statements to the prosecutor, and his statement to Officer Hackleman.

Further, as discussed *ante* in section I, subdivision (D) of the Discussion, there was strong evidence of Conerly's guilt. First, law enforcement determined the cell phone seized from Conerly's person had transmitted from the same cell tower as Webber's, Hubbard's, and Davis's phones throughout the day on December 19, and those same phones transmitted from the same cell tower near the site of the Castleford shooting at the time of the shooting. Second, Conerly's cell phone contained searches for Glock firearms, which were similar to the types of firearms used during the shooting. Finally, and most importantly, Conerly was found with a loaded Polymer 80 firearm on his person – the same firearm that had fired 20 of the 71 shell casings recovered from the Castleford shooting scene. Therefore, this evidence provided the jury with ample evidence to establish that Conerly was present and participated in the Castleford shooting.

Accordingly, because Conerly's attorney had ample opportunity to cross-examine C.P. to address any potential inconsistencies in his testimony, along with the fact there was strong evidence in support of Conerly's guilt, Conerly has failed to establish "a reasonable probability . . . that a different result would have occurred in the proceeding had the evidence been disclosed to the defense." (*Jenkins*, *supra*, 22 Cal.4th at p. 954; *Zambrano*, *supra*, 41 Cal.4th at p. 1132.)

## **DISPOSITION**

Hubbard's, Webber's, Davis's, and Conerly's sentences are vacated, and this matter is remanded for resentencing consistent with this opinion. Pursuant to Assembly Bill 333, we reverse the following as to each individual defendant:

## I.   Hubbard

-Substantive gang offense (§ 186.22, subd. (a), count 13);

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 6, and 11;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Carrying a loaded firearm as an active gang member (§ 25850, subds. (a), (c)(3), count 7).

## II.   Webber

-Substantive gang offense (§ 186.22, subd. (a), count 13);

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 2, 4, 5, and 6;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Use of a firearm that proximately caused great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), as alleged in count 5.

## III.   Davis

-Substantive gang offense (§ 186.22, subd. (a), count 13);

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 7;

-Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;

-Carrying a loaded firearm as an active gang member (§ 25850, subds. (a), (c)(3); count 7).

## IV.   Conerly

-Substantive gang offense (§ 186.22, subd. (a), count 13);

-Gang enhancements (§ 186.22, subd. (b)(1)), as alleged in counts 1 through 6, and 8;

> -Gang-related firearm enhancement (§ 12022.53, subd. (e)(1)), as alleged in counts 1, 3, and 5;
>
> -Carrying a loaded firearm as an active gang member (§ 25850, subds. (a), (c)(3); count 7).

The People are barred from retrying these offenses, enhancements, and allegations on remand. Thereafter, the trial court is directed to file an amended and corrected abstract of judgment and transmit copies thereof to the appropriate authorities. In all other respects, the judgment is affirmed.

FAIN, PRO TEM J.*

WE CONCUR:

DETJEN, Acting P. J.

DE SANTOS, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.